**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,** *ex rel.*
**JAMES HANNUM,**

     **Plaintiffs,**

  **vs.**           Civil Action No. 08-CV-0811

**YRC FREIGHT, INC.; ROADWAY**    **COMPLAINT AND**
**EXPRESS, INC.; and YELLOW**     **DEMAND FOR JURY TRIAL**
**TRANSPORTATION, INC.**

     **Defendants.**
_____

## THE UNITED STATES' COMPLAINT IN INTERVENTION

The United States of America ("United States") alleges as follows:

1.  Starting in September 2005 and continuing until at least October 2013, Defendants YRC Freight, Inc. ("YRC"); Roadway Express, Inc. ("Roadway"); and Yellow Transportation, Inc. ("Yellow") engaged in a fraudulent scheme to use inflated cargo weights to deliberately overcharge the United States Department of Defense ("DOD") for freight services.  Accordingly, this action seeks treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, as well as available common law remedies, from the Defendant freight companies.

2.  In 2003, Roadway and Yellow began to merge into the company that would become YRC.  In 2005, as part of this process, Roadway and Yellow tried to increase their revenue by checking the weight of each load of cargo that passed through their freight terminals.  The Defendants' revenue depended in large part upon the weight of their shipments, with heavier shipments typically leading to more revenue.  The Defendants thus

typically received more revenue from a "positive reweigh correction" where their weight verification, or "reweigh," indicated that the shipment was heavier than the stated weight. Conversely, when the Defendants' reweigh indicated that the shipment was actually lighter than the stated weight, the resulting "negative reweigh correction" would generally reduce the price of the shipment and diminish the Defendants' revenue.  In the aggregate, the Defendants had more positive reweigh corrections than negative reweigh corrections, so reweighing and correcting more shipment weights helped increase their earnings.

3.      Not content with its revenue boost from additional reweighs, Roadway stopped making negative reweigh corrections in September 2005.  This meant that although Roadway continued to correct weights when its reweigh results meant it could charge its customers more, the company stopped correcting weights when its reweigh revealed that the customer was entitled to a credit or discount because the shipment was actually lighter than the stated weight.  In early 2006, Yellow likewise established a similarly skewed reweigh practice where it would not correct inaccurate weights if the error was in its favor.  The companies merged into what is now YRC in 2009, and continued to systematically suppress negative reweigh corrections for their DOD shipments until at least October 2013.

4.      The Defendants understood that their one-sided reweigh practices were wrong.  In October 2004, an internal Yellow email noted that overcharging through reweighs "creates an integrity problem for Yellow with every affected customer."  Yet approximately one year later, the Defendants essentially made it their policy to overcharge customers by voiding negative reweigh results.

5.      Moreover, in 2005, Yellow conducted an informal survey of freight carriers in which it found that nearly all of its competitors believed that failing to make negative

reweigh corrections "was a breach of faith with their customers and undermined the integrity of the [reweigh] program." The Defendants also confirmed in 2007 that they were the only freight carriers to systematically quash negative reweigh corrections.

6.     In addition, the Defendants deliberately concealed the evidence that they were cheating their customers, including DOD. As described in an internal email from 2009, when YRC employees attempted to make a negative reweigh correction, the company's computer system would automatically reject the entry and hide the negative reweigh by falsely recording the problem as "Can Not [sic] Find Employee Number."

7.     The Defendants did not inform DOD that they were only correcting weights when the Defendants stood to benefit. To the contrary, the Defendants repeatedly represented to DOD that they would either notify DOD if their reweighs revealed a weight discrepancy or would correct the erroneous weight themselves and recalculate the charges.

8.     As a result of their deceitful scheme, the Defendants knowingly submitted thousands of false claims to DOD that used inflated weights to overcharge the government. The Defendants also knowingly made false statements to induce DOD to give them business and further knowingly made or used false statements to avoid their contractual obligations to correct inflated invoices and return overpayments.

9.     These false claims and false statements were material, as they had a natural tendency to influence DOD's decisions to pay the Defendants or indeed do business with them at all. The Defendants' false claims and false statements ultimately resulted in DOD paying millions of dollars more for freight shipping than it would have if the Defendants were honest.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345.  This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants conduct business in this district and some of the events which gave rise to this action occurred in this district.

11.     One or more of the Defendants transacted business and committed acts proscribed by 31 U.S.C. § 3729 in the Western District of New York.  Therefore, venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c).

## PARTIES

12.     The United States brings this action on behalf of the Department of Defense ("DOD").  DOD is an Executive Department of the United States government charged with coordinating and supervising the United States military, among other functions.

13.     James Hannum is the Relator in this case.  He filed his *qui tam* complaint on behalf of the United States on November 3, 2008.  Mr. Hannum is a resident of Dunkirk, New York, within the Western District of New York.  Mr. Hannum has worked for Roadway, and then YRC, for over 30 years at its facility in Buffalo, New York.

14.     YRC is an incorporated freight company that transports industrial, commercial, and retail goods in North America.  Its headquarters and principal place of business are at 10990 Roe Avenue, Overland Park, Kansas 66211.  YRC is a subsidiary of YRC Worldwide, Inc., which is an American holding company for various shipping entities.  In 2009, Roadway and Yellow merged to become YRC, Inc.  The name of the company was changed to its current iteration, YRC Freight, Inc., in 2012.

15.     The YRC merger began in 2003, when Yellow purchased Roadway.  The two companies still operated separately and had separate corporate structures, but Roadway and Yellow started to share some corporate functions and what they considered to be "best practices."  However, the companies remained independent in the marketplace until they officially merged in 2009 to become YRC, Inc.

16.     Prior to the YRC merger, Roadway was an incorporated company with headquarters and a principal place of business in Akron, Ohio.

17.     Prior to the YRC merger, Yellow was an incorporated company with headquarters and a principal place of business in Overland Park, Kansas.

## THE FALSE CLAIMS ACT

18.     The False Claims Act ("FCA"), establishes liability for knowingly making, submitting, or causing false or fraudulent claims for federal funds.  31 U.S.C. § 3729(a)(1) (through May 19, 2009) and 31 U.S.C. § 3729(a)(1)(A).

19.     The FCA also establishes liability for knowingly making, using, or causing false records or statements material to false or fraudulent claims for federal funds.  31 U.S.C. § 3729(a)(1)(B).[1]

20.     For conduct occurring through May 19, 2009, any person who knowingly makes, uses, or causes a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the federal government is also subject to liability under the FCA.  31 U.S.C. § 3729(a)(7) (through May 19, 2009).  For conduct occurring

---

[1]  Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA") amended the FCA on May 20, 2009.  Section 4(f) of FERA set forth that Section 3279(a)(1)(B) "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. §§ 3729 et seq.) that are pending on or after that date."  This retroactivity provision applies only to FCA claims filed under Section 3729(a)(1)(B).

after May 19, 2009, a person who knowingly makes, uses, or causes a false record or statement material to an obligation to pay or transmit money to the government or any person who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government, is also liable under the FCA.  31 U.S.C. § 3729(a)(1)(G).

21.    Under the FCA, the term "knowingly" means that a person (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1)(A).

22.    No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA.  31 U.S.C. § 3729(b)(1)(B).

23.    The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

24.    The FCA provides for a recovery of three times the damages sustained by the United States (treble damages), plus a civil penalty for each violation of the Act.  31 U.S.C. § 3729(a)(1).

25.    The civil penalty for an FCA violation is to be not less than $5,500 and not more than $11,000.  *See* 31 U.S.C. § 3729(a) (through May 19, 2009); 31 U.S.C. § 3729(a)(1); and 28 C.F.R. § 85.3(a)(9).

26.    The United States may bring an action under the FCA within six years of the violation.  31 U.S.C. § 3731(b)(1).  If the United States intervenes in a relator's *qui tam* complaint and files its own complaint that "arises out of the conduct, transactions, or

occurrences" set forth by the relator, for statute of limitation purposes the United States' pleading "shall relate back to the filing date of the complaint of the person who originally brought the action." 31 U.S.C. § 3731(c).  The Relator filed his complaint on November 3, 2008, and the United States Complaint' in Intervention is timely for violations occurring on or after November 3, 2002.

## THE DEFENDANTS' CONTRACTS WITH DOD

27.     The Federal Acquisition Regulation ("FAR") is the principal regulation that governs United States government contracts.  *See* FAR 1.101.  Federal procurement contracts also may incorporate standard contract provisions found in Part 52 of the FAR.

28.     The Military Surface Deployment and Distribution Command ("SDDC") is part of the United States Transportation Command ("USTRANSCOM"); a unified command consisting of various transportation commands from different branches of DOD. SDDC is the United States Army component of USTRANSCOM.  On January 1, 2004, the name of this command changed from the Military Traffic Management Command to its current name.  For simplicity's sake, this Complaint will only refer to this command as "SDDC."

29.     During the relevant period, SDDC awarded the Defendants different contracts to provide various freight transportation services throughout the continental United States.  These contracts included the following:

| Contract Number | Vendor | Date of Award | Estimated Date of Completion |
|---|---|---|---|
| DAMT01-03-D-0044 | Roadway | December 6, 2002 | October 31, 2006 |
| DAMT01-03-D-0046 | Yellow | December 6, 2002 | October 31, 2006 |
| W81GYE-06-D-0072 | Yellow | February 28, 2006 | April 30, 2009 |
| W81GYE-06-D-0073 | Roadway | February 28, 2006 | October 21, 2009 |

30.     All of these contracts included FAR 52.212-4(g), which required Roadway and Yellow to submit invoices containing the "quantity," "unit of measure," and "unit price" for the items delivered.

31.     Contracts DAMT01-03-D-0044 and DAMT01-03-D-0046 additionally included a provision specifically governing shipment reweighs.  Specifically, the contracts authorized Roadway and Yellow "to reweigh a shipment at any time prior to delivery," but stated that if the "revised shipping weight" varied by more than 10 percent from the original weight, the contractor "must notify [DOD] by the next business day of the new weight."

32.     Contracts W81GYE-06-D-0072 and W81GYE-06-D-0073 also incorporated FAR 52.212-4(i)(5), which required Yellow and Roadway, upon becoming aware of DOD overpaying on an invoice, "to immediately notify the Contracting Officer and request instructions for disposition of the overpayment."

**THE DEFENDANTS' TENDER AGREEMENTS WITH DOD**

33.     In addition to formal contracting procedures, DOD also uses a streamlined process to award freight business to carriers who have already been approved by SDDC. When transportation offices for DOD components wish to select a carrier to move freight, they can obtain a list of approved carriers and these carriers' applicable tenders of service from SDDC's database.  The DOD component transportation office then makes its selection and enters into a tender agreement with the carrier.

34.     The SDDC's Freight Traffic Unified Rules Publication, which is commonly referred to as the "MFTRP" and is updated periodically, provides rules governing these tenders.  The MFTRP is intended to explain DOD's service needs, ensure that carriers are willing and able to meet these needs, and establish common standards throughout DOD so

that the agency's transportation offices do not have to undertake formal solicitation and contracting processes every time they want to purchase freight services.

35.     For example, the MFTRP has consistently required a carrier to have proof of delivery, such as a copy of the bill of lading,[2] before it can be paid by DOD.

36.     Once approved by SDDC, carriers must have a paper or electronic tender of freight services on file with SDDC to move DOD freight.  When submitting tenders for freight services to SDDC, a carrier must cite the MFTRP as the only rules governing the ultimate transaction.  If the carrier does not, SDDC can designate the tender as improper and remove it from its database.

37.     The MFTRP issued by SDDC on January 4, 2004, stated that if "a carrier independently performs a shipment weight verification and discovers a discrepancy between the verified weight and the weight shown on the [bill of lading], it is the carrier's responsibility to obtain a [bill of lading] correction notice from the origin [transportation office]."  This rule governing reweigh corrections stayed in effect until March 1, 2009.

38.     The MFTRP issued by SDDC on March 1, 2009, had modified reweigh provisions, but the core requirements remained intact.  Carriers could still reweigh shipments at their discretion and were required to provide DOD with notice and certified weight tickets if "the revised shipping weight varie[d] by more than 10 percent of the estimate of the shipping activity."  DOD would only pay carriers for positive reweigh corrections if they provided such notice and proof of the changed weight.

---

[2]   As noted below, a bill of lading is a common transportation term for the basic agreement that underlies the shipment of goods.

39.     The MFTRP issued on March 1, 2009, also set forth basic requirements that a carrier had to meet "in order to become SDDC approved to transport DOD freight."  These requirements included adhering to the "common law implied covenant of acting in good faith and fair dealing."

40.     Finally, the DOD revised the MFTRP's weight verification requirements, among other provisions, on July 31, 2013.  Under the revised rules, if there was a weight discrepancy that caused "an increase or decrease to the total shipment cost from the original [bill of lading]," the MFTRP required carriers to request a correction notice from DOD so that the weight listed on the bill of lading could be corrected.   This MFTRP also required carriers to follow common law standards of "good faith and fair dealing" in order "to become SDDC approved to transport DOD freight."

## STATEMENT OF FACTS

41.     By virtue of the conduct alleged below, the Defendants knowingly submitted false claims to DOD for shipments that actually weighed less than the weights the Defendants used when charging the government.  The Defendants also knowingly made false statements to SDDC that they would comply with the MFTRP and would correct any discrepancies uncovered during the reweigh process.  Finally, the Defendants made or used false statements or records to conceal or avoid their contractual obligations to return overpayments to DOD.

**I.     Freight carriers often reweighed shipments to verify that the weight was correct.**

42.     Typically, the Defendants and other freight carriers picked up a shipment at its origination, transported it to the carrier's terminal, and then loaded it onto a different vehicle for delivery to the final destination.  Throughout this process each shipment was

accompanied by a bill of lading, which was an agreement between the customer and the carrier that documented key information about the shipment, including its weight, destination, and the distance it needed to travel.  The bill of lading also listed and acknowledged the carrier's receipt of goods for transport, specified the terms of delivery, and served as either the basis for the carrier's ultimate invoice or the actual invoice submitted to the customer.

43.     A shipment's weight and the distance traveled generally determined the applicable rate and final fee for the freight service.  As one YRC executive stated in an internal email, "the weight drives the price we charge and invoice the customer."

44.     While shipments were at a freight carrier's terminal or warehouse, the carrier could check to make sure that the information on the bill of lading was correct.  This verification often included reweighing the shipment.

**II.     Historically, the Defendants made positive and negative reweigh corrections.**

45.     Before September 2005, the Defendants' reweighs caused them to correct bills of lading for both "positive" reweighs where the revised shipment weight was heavier than the original weight, and "negative" reweighs where the revised weight was lighter than the original weight.  Positive reweigh corrections typically increased the cost of the shipment, and thus the Defendants' revenue, while negative reweigh corrections typically benefitted the Defendants' customers by reducing the cost of the shipment.

46.     The Defendants believed that it was important for reweighs to be accurate. For example, in October 2004, reflecting Yellow's concern that one of its terminals was falsely increasing weights during the reweigh process, an internal Yellow email noted that such overcharging "creates an integrity problem for Yellow with every affected customer."

47. Yellow further recognized that making negative reweigh corrections was vital to its credibility. As set forth in an internal email from May 2005, Yellow deliberately excluded negative reweigh corrections when it issued internal tracking reports of all reweigh correction revenue, lest the reduced revenue "discourage anyone from doing the 'right thing' by [making] a negative revenue correction."

48. Similarly, according to an internal email from June 2005, Roadway was "opposed to using net numbers" when assessing the impact of reweigh corrections "as it sends the wrong message to those responsible for [making] corrections – IE don't [make] corrections in favor of the customer."

49. On August 22, 2005, Roadway streamlined its reweigh procedures so that the company could automatically update its records with any new weights and correct the company's charges accordingly. As set forth in an internal email to company managers, new scales and wireless tracking devices enabled Roadway to "capture all positive and negative weight corrections regardless of the weight difference." The managers were further instructed to emphasize that the "integrity of correction information is critical in providing the customer with an accurate invoice and supporting documentation."

50. Roadway immediately enjoyed the benefits of the streamlined reweigh procedures. According to an internal email from September 1, 2005, Roadway's new procedures had already caused a surge in reweigh corrections "that turned into a 50% increase in revenue."

51. But Keith Rawson, then the Senior Director for Revenue Management for Yellow Roadway Enterprise Services (the entity overseeing the merger between Yellow and Roadway), observed in the same internal email that the increase in reweighs also caused "a

problem with negative corrections (i.e. weight went down and now giving back money.)"
As a result of this "problem," Rawson reported that Roadway had begun "analyzing limits
on negative reweighs."  Rawson further noted that eliminating negative reweigh corrections
was an "opportunity" that could allow Roadway and Yellow to keep a combined $2 million
per month.

III.    **In 2005 and 2006, the Defendants decided to boost their revenue at the expense
of their customers, including DOD, by eliminating negative reweigh
corrections.**

52.    On September 13, 2005, Roadway essentially eliminated negative reweigh
corrections.

53.    Dean Frye, then a senior manager at Roadway, sent a widely distributed
internal email on October 3, 2005, that informed his colleagues that the company had
implemented a programmatic change that "eliminate[d] the automated issuance of negative
weight corrections."  According to Frye, this meant that, with a few exceptions, "***[n]egative
weight corrections will no longer be [made].***"  (Emphasis in original).

54.    After implementing its new reweigh practices, Roadway instructed all its
freight handlers, weight coordinators, and inspectors that generally "[n]o negative weight
corrections will be [made]."  A negative reweigh correction could still be made manually in
certain circumstances, but the elimination of automated negative reweigh corrections was
estimated to save Roadway $1 to $1.5 million in revenue per month by avoiding reduced
charges to customers.

55.    Rawson noted in an internal email on September 19, 2005, that "Roadway
had basically done this on [its] own," but that he and other executives in charge of having
Yellow and Roadway adopt each other's "best practices" could take credit if "we consider it

13

a best practice and implement [it] at Yellow."  Such cross-company adoption was commonly referred to as "synergy."

56.     On September 26, 2005, Joe Whitsel, a Vice President for Revenue Management at Yellow Roadway Enterprise Services, responded to Rawson that "[w]e need to make this [elimination of negative reweigh corrections] happen – I need the numbers to make [our] synergy goal for the year."

57.     Rawson sent another email to Whitsel on September 29, 2005.  Rawson stated that eliminating negative reweigh corrections would allow Yellow to "retain approximately $6 million per year ($500k per month)."  Rawson also expected these earnings to grow as Yellow joined Roadway in streamlining its reweigh process so that revised weights were automatically recorded.  These findings were forwarded to Todd Hacker, Yellow's Senior Vice President for Finance & Administration, who replied that it would be discussed with Yellow's President, James Welch.

58.     On October 3, 2005, Whitsel told Mike Smid, Roadway's President and CEO, that "we are recommending that Yellow follow Roadway's lead and implement the elimination of the negative revenue adjustments."  Smid responded that he was not sure he agreed with a complete elimination and that there was "a right number in order to give our [reweigh] program some credibility."

59.     In response, Rawson analyzed various negative weight tolerance scenarios under which weight or revenue variances above a certain level would still be disclosed and credited to customers.  On October 13, 2005, Rawson reported his findings in an email to Whitsel.  According to Rawson, to reduce negative reweigh corrections by half, the Defendants could "only process a weight correction if the weight changes by more than

70%." Alternatively, Rawson noted that the Defendants could set a dollar tolerance, rather

than a weight tolerance. But to cut negative reweigh corrections in half, the tolerance would

have to be set at negative $800, meaning that a weight drop that reduced revenue by $799 or

less for a shipment would not be disclosed and credited to a customer. As Rawson stated,

this "would also be hard to explain" because the Defendants were not contemplating

imposing a similar tolerance for positive reweigh corrections.

60.     Ultimately, Rawson recommended that "if we are going to do it, let's go all

the way." He reasoned that it "would be just as difficult to explain the difference in the

positive and negative tolerance vs. saying we don't have one." Rawson further noted that if

the Defendants had to have "the 'tolerance conversation' with the customer, then we're

probably going to end up waiving it anyway." In other words, Rawson believed that once a

customer learned of the Defendants' reweigh practices, the Defendants would likely have to

start making negative reweigh corrections for that customer in order to keep the business.

61.     On October 27, 2005, Rawson provided Whitsel with a summary of his

findings and recommendations regarding the Roadway and Yellow reweigh programs.

Rawson stated that the Defendants "could see $10-20 million in annualized revenue from a

best practice weight correction program." He also found that Yellow was considering

eliminating negative reweigh corrections and that this would represent about $500,000 in

"revenue retained per month," while Roadway had already eliminated negative reweigh

corrections and was retaining about $1.5 million per month in revenue.

62.     On or about October 24, 2005, Hugh Gaynor, a Revenue Management

executive at Yellow, attended an industry meeting in which reweigh practices were

discussed. At Gaynor's request, the other freight companies stated their policy on negative

reweigh corrections.  According to Gaynor, almost all of these companies "believed that not [making negative reweigh corrections] was a breach of faith with their consumers and undermined the integrity of the program."

63.     On November 2, 2005, Whitsel reported to another Yellow Roadway Enterprise Services executive that, aside from Roadway, only two other freight companies were not "entering negative weight corrections."

64.     Yellow's executive leadership, including President James Welch, ultimately decided to copy Roadway and stop making negative reweigh corrections.

65.     On January 5, 2006, Rawson and Whitsel placed a formal request for Yellow to eliminate all negative reweigh corrections.  In the work request, Rawson and Whitsel ordered that Yellow "eliminate the negative adjustments" so it could "add [about] $500,000 per month to top and bottom line (revenue and profit)."

66.     Yellow stopped making negative reweigh corrections on or around February 27, 2006.

67.     In a March 1, 2006, email that was in response to questions from Yellow employees, Gaynor stated that Roadway had not been making negative reweigh corrections for six months and that "Yellow Senior Management has decided to follow suit and not process negative adjustments."  Gaynor further emphasized that "[t]**his information is for your use only and should not be communicated outside of our team.**" (Emphasis in original.)

68.     As with Roadway, Yellow's new reweigh policy generated rapid results.  An internal presentation from June 15, 2006, demonstrated that, in just a few months, Yellow

had largely succeeded in reducing or eliminating "the number of [reweigh corrections] that result in a negative revenue change."

69.     Meanwhile, the Defendants continued to focus on positive reweigh revenue. In an internal email from January 4, 2007, Gaynor reiterated what he "had said on our conference calls," which was that "we need to _actively promote_ the reweigh program." (Emphasis in original.)  Two weeks later, on January 16, 2007, Gaynor sent another internal email that described Yellow's recent revenue figures as "horrible" and exhorted his colleagues "to push the weight revenue and number of reweighs as well … do not forget to push the reweighs."

70.     Yellow spent approximately $2 million on new scales in 2007.  As a result, according to an internal email from November 20, 2007, some Yellow terminals showed "a significant improvement in reweigh revenue [when] compared to November 2006." However, other terminals were "flat or even show decreases in reweigh revenue."  Yellow found this to be "completely unacceptable" because it "must realize the expected revenue increase" from its investment in new scales.  Accordingly, Yellow instructed its managers "to actively monitor the reweigh activity at their terminals" and "hold their teams responsible for weighing freight and using the equipment provided to ensure we are properly compensated for every shipment we haul."

71.     The next day, Gaynor and other Yellow executives forwarded this email to Yellow employees throughout the company.  Gaynor stated that the email "speaks for itself" and instructed Yellow personnel to "not discuss it with anyone outside our team." Gaynor also suggested that managers "[d]o whatever you can to shine a spotlight on the reweigh results in your terminal."

72.    But notwithstanding the Defendants' desire to be paid according to the correct weight when it benefited them, they continued to monitor their reweigh activity to make sure that they were not correcting weights if it would benefit their customers.

73.    In January 2007, Whitsel asked a colleague whether Yellow was still making negative reweigh corrections.  On January 23, 2007, the colleague confirmed by email that Yellow was making "very few negative [weight] adjustments."  Specifically, out of more than 1.5 million invoices between November 13, 2006, and January 20, 2007, Yellow made 42 negative reweigh corrections.  In contrast, Yellow made 75,324 positive reweigh corrections during the same period.

74.    Hugh Gaynor conducted another informal industry survey on negative reweigh practices in September 2007.  Unlike the Defendants, all twelve companies that responded confirmed that they made negative reweigh corrections.

75.    Yet the Defendants maintained their secret prohibition on correcting weights when it benefited their customers.  On March 17, 2009, Don Geisler, a business development executive at YRC, emailed Whitsel because he had "noticed that we are passing along changes in favor of the customer … when the weight is corrected to a lesser [number] and the corrected revenue results in a lower charge, the savings is passed along to the customer."  Geisler "thought we had blocked that as part of the 'best practice' synergy work" and listed six offending shipments where he believed YRC had made negative reweigh corrections.

76.    In turn, Whitsel forwarded the email to his colleagues, noting that he "thought we had stopped negative corrections as part of synergies."  Whitsel was assured that "negative reweighs were stopped" and that the shipments with negative revenue

adjustments were the result of situations where YRC had not been able to "determine the revenue impact" of non-weight corrections.  James Faas, YRC's Director of Weights and Inspections, also noted that for two of the six shipments at issue, the company "had an agreement on [sic] to cut back if the weight was found to be lower" because former YRC employees told these customers that "YRC was cheating them, so the deal was made to retain to the business."

77.    But as one YRC employee explained in an internal email from May 21, 2009, the company would not ordinarily make a "negative weight change."

78.    In February 2010, one YRC senior analyst had a daily calendar reminder to check for negative reweigh corrections to ensure they were not "the fault of anyone at YRC."

79.    An internal YRC email from February 18, 2011, also confirmed that the company was still not correcting weights when its reweigh indicated there was a "negative weight change."

80.    On April 7, 2011, following a "talk about integrity this morning," one YRC manager commented in an internal email that "perhaps we need to revisit the negative weight correction logic" because it was putting YRC's relationships with its customers at risk.  In response, a colleague noted that making negative reweigh corrections "has been previously discussed and the decision was made to leave it [the] way that it is currently."

81.    Another YRC employee asked a colleague on October 4, 2011, whether negative reweigh corrections were counted against a terminal's revenue.  His YRC colleague replied that he had been told "that the customer does not receive a lowered invoice" and that the "negative scans never change the mainframe data," but asked a manager for

confirmation.  The manager responded that "for now we do not systemically [make]

negative [reweigh] corrections," but added that "at some point we may to add further

credibility to our process."

82.     Notwithstanding their concerns about integrity and credibility, the

Defendants continued to suppress negative reweigh corrections for their DOD shipments

until at least October 2013.  It is unclear if the Defendants maintained this practice after

October 2013 for DOD and other customers.

**IV.    The Defendants' dishonest reweigh practices caused them to submit false claims to DOD.**

83.     The Defendants knowingly submitted false claims for payment to DOD for

shipments that actually weighed less than the weights the Defendants used when charging

the government.  The invoices, or bills of lading that served as invoices, that the Defendants

submitted to DOD falsely represented shipment weights to be higher than the actual weights

measured by the Defendants' own scales, resulting in inflated charges to DOD.

84.     Between September 2005 and June 2010, the Defendants did not keep records

of the negative reweigh corrections that they systematically cancelled during this period.

85.     From at least June 2009 to June 2010, the Defendants also hid evidence of

their misconduct by programming their computer system so that negative reweigh results

would not register.

86.     For example, as stated in an internal email sent on June 26, 2009, YRC

programmed its computer system so that negative reweigh results would "never show up in

the mainframe . . . to be recorded."  Negative reweigh results were instead automatically

rejected and then *"hidden"* by recording the reason for the rejection as "CAN NOT [sic]

FIND EMPLOYEE NUMBER," even though YRC also had an error code for

"NEGATIVE WEIGHT CORRECTION PROHIBITED." (Emphasis in original.)

87.     As stated in an internal email from March 3, 2010, YRC continued to

program its computer system to "check to see if the reweigh information is negative" and "if

so the system will delete all negative reweigh information."

88.     The Defendants retained records of their negative reweigh shipments billed to

DOD between June 2010 and October 2012.  Exhibit A to this Complaint provides 200

examples of the more than 13,000 false claims the Defendants billed to DOD during this

period.

89.     According to the records the Defendants kept for their billings to DOD

between June 2010 and October 2012, the Defendants submitted to DOD approximately

725 false claims per month.  Based on an extrapolation of those false claims per month to

the September 2005 to October 2013 period at issue, the Defendants submitted to DOD

approximately 70,000 false claims predicated on weights that they knew were too heavy.

The Defendants submitted these false claims pursuant to numerous tender agreements with

DOD, as well as contracts DAMT01-03-D-0044 (Roadway), DAMT01-03-D-0046 (Yellow),

W81GYE-06-D-0072 (Yellow) and W81GYE-06-D-0073 (Roadway).

**V.     When submitting tenders to SDDC, the Defendants provided false promises of MFTRP compliance and false assurances regarding their reweigh practices.**

90.     When trying to obtain business from DOD, the Defendants falsely promised

SDDC that they would comply with the MFTRP and, in some cases, that they would

correct the billed weight if their reweigh revealed a discrepancy.

91.     The Defendants made these false statements in the tenders for freight services

that they submitted to SDDC.

92.     For instance, on October 27, 2008, Yellow sent an exemplar tender to SDDC. In this tender, Yellow promised that when it reweighed a shipment, it would "correct the billed weight accordingly." Yellow further assured SDDC that "[i]f the bill of lading is found to be incorrect, Yellow will adjust the billed weight and recalculate charges on the adjusted billed weight." Yellow's exemplar tender was, therefore, patently false, because Yellow was not generally correcting the billed weight and recalculating charges when the reweigh results were negative and DOD stood to benefit.

93.     In addition, all of the Defendants' tenders also stated that they would abide by the MFTRP. And as YRC acknowledged in an internal email sent on January 21, 2010, the MFTRP required "that carriers are to be compensated based on the actual weight of the shipment."

94.     Specifically, from January 4, 2004 through February 28, 2009, the MFTRP required carriers that independently reweighed a shipment to "obtain a [bill of lading] correction notice" from the government if the carrier discovered a discrepancy between the weight listed on the bill of lading and "the verified weight."

95.     Likewise, from March 1, 2009, through July 30, 2013, the MFTRP required carriers to provide DOD with notice and certified weight tickets if "the revised shipping weight varie[d] by more than 10 percent of the estimate of the shipping activity." During this period, the MFTRP also set forth basic requirements that a carrier had to meet "in order to become SDDC approved to transport DOD freight." Included in these requirements were adhering to the "common law implied covenant of acting in good faith and fair dealing."

96.     Finally, the MFTRP that was effective on July 31, 2013, required carriers to request a correction notice from DOD so the government could correct the bill of lading if the carrier independently discovered a weight discrepancy that caused "an increase or decrease to the total shipment cost from the original [bill of lading]."  This MFTRP also required carriers to adhere to the "common law implied covenant of acting in good faith and fair dealing" in order to be approved by SDDC for DOD freight business.

97.     In all of their tenders the Defendants promised SDDC that they would adhere to the MFTRP's rules.  But as demonstrated by the conduct alleged above, these statements were false because the Defendants did not make negative reweigh corrections or notify DOD that such corrections were warranted.  Moreover, given that the Defendants themselves recognized that their reweigh practices lacked integrity, they did not act in good faith or engage in fair dealing when doing business with DOD.

98.     SDDC relied upon Defendants' false statements when it approved the Defendants as freight carriers.  SDDC further relied on the Defendants' false statements when it accepted the Defendants' tenders and placed the tenders in SDDC's database.  Had SDDC known the truth, it would have rejected the Defendants' tenders or removed them from its database and the Defendants would not have been able to use the tenders to obtain business from DOD.

99.     Lists of the Defendants' tenders for the relevant period that SDDC accepted and placed in its database are attached to this Complaint as Exhibit B (Roadway), Exhibit C (Yellow), and Exhibit D (YRC).

**VI.**   **The Defendants made or used false statements or records to avoid their contractual obligation to return overpayments to DOD.**

100.   As noted above, DOD's 2006 contracts with Yellow (W81GYE-06-D-0072) and Roadway (W81GYE-06-D-0073) incorporated FAR 52.212-4(i)(5), which required Yellow and Roadway, upon becoming aware of DOD overpaying on an invoice, "to immediately notify the Contracting Officer and request instructions for disposition of the overpayment."

101.   The Defendants did not meet this obligation to disclose and return overpayments to DOD.  Instead, as alleged above, they knowingly made or used false statements regarding shipment weights on bills of lading and invoices to conceal or avoid their obligation.

102.   In addition, the Defendants knowingly concealed, or knowingly and improperly avoided, their obligation to return overpayments to DOD.   By not making negative reweigh corrections even when they knew they were warranted, the Defendants ensured that DOD would unwittingly overpay for such shipments.  The Defendants knew that the corresponding weights provided on their bills of lading or invoices were false, yet still used these false figures when charging DOD.  The Defendants also did not disclose that they had reweighed the shipments and found the true weight to be lighter than the stated weight.  Consequently, the Defendants knew they were being overpaid by DOD.  But because the Defendants did not correct the stated weight, DOD did not know that it was overpaying for these shipments.  The Defendants thus made or used false statements to conceal their inflated invoices and avoid their contractual obligation to return overpayments to DOD.

24

**VII.    The Defendants' false claims and false statements were material under the False Claims Act.**

103.    The False Claims Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(a)(4).

104.    Under this definition, the Defendants' false claims and false statements were material, as they had a natural tendency to influence DOD's decisions to pay claims, award contracts, accept tenders, and not try to recover overpayments.

105.    First, the Defendants deliberately overcharged DOD on thousands of invoices by suppressing negative reweigh corrections.  Because the amount DOD paid depended upon the weight of the shipments, the Defendants' failure to correct weights when it would result in a lower price was capable of influencing DOD's payment decisions.  In addition, had DOD known the truth, it would have paid the Defendants based on the actual weight of the shipments – as revealed by the Defendants' own negative reweigh results – rather than the inflated weight the Defendants billed.  As one YRC employee asked rhetorically in an internal email from January 29, 2008, "what customer would not want to reduce their charges?"

106.    Indeed, the Defendants repeatedly emphasized in internal communications that it was important for them to reweigh shipments in order to receive the payments they were owed.  For example, in January 2011, YRC wanted to make posters to encourage its dock workers to reweigh shipments.  One employee suggested using old materials from "a few years ago."  These materials analogized YRC's reweigh program to when "you walk into a Post Office with a package to mail" and the clerk weighed "the shipment to apply the proper postage."  "Accurate weights," according to these materials, "lead to fair rates for

consumers, and most importantly, a fair profit for us.  We only want to get credit for what we are hauling."

107.    Second, the Defendants' false statements about making appropriate weight corrections and complying with the MFTRP were also material.  Those false statements were capable of influencing SDDC's decision to approve the Defendants as freight carriers, as well as SDDC's decision to accept the Defendants' tenders and place them in SDDC's database.  Without SDDC's approvals and acceptances, DOD transportation offices would not have selected the Defendants' tenders for moving freight.  In fact, starting in 2009, the MFTRP specifically included "acting in good faith" and engaging in "fair dealing" as basic requirements that a carrier had to meet in order to do business with DOD.

108.    The Defendants also recognized that their customers would consider their one-sided reweigh practices to be a significant breach of trust that was capable of putting their business at risk.  For instance, the Defendants assumed that once a customer discovered that the Defendants were not generally making negative reweigh corrections, they would have to make an exception for that customer in order to keep their business.  As alleged above, these assumptions were proved correct, as the Defendants ultimately granted exceptions for various customers who discovered the Defendants' scheme.  In addition, the above allegations are replete with examples of the Defendants acknowledging that fraudulent reweigh practices created an actual or potential integrity problem with customers.

109.    Finally, the Defendants' false representations relating to specific shipments were material to the Defendants' obligation to return overpayments to DOD.

110.    DOD officials were unaware that the Defendants had overcharged the government for shipments that warranted, as shown by the Defendants' own scales, a

negative reweigh correction.  To the contrary, these shipments would have appeared to be normal, with no characteristics distinguishing them from those shipments where the Defendants used an accurate weight to charge DOD.  Had the government known, it would have sought to recover overpayments to ensure that it was only paying for the actual shipment weights.

## CLAIMS FOR RELIEF

### Count I:  Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) (through May 19, 2009) and 31 U.S.C. § 3729(a)(1)(A), by Making, Submitting, or Causing False Claims

111.    The United States re-alleges and incorporates by reference paragraphs 1-110.

112.    The United States seeks relief against the Defendants, jointly and severally, under the False Claims Act, 31 U.S.C. § 3729(a)(1) (for claims submitted through May 19, 2009), and, as amended, 31 U.S.C. § 3729(a)(1)(A) (for claims submitted on or after May 20, 2009).

113.    In connection with the foregoing scheme, between September 2005 and October 2013, the Defendants knowingly made, submitted, or caused false or fraudulent claims to the United States for payment or approval based on heavier weights than what the Defendants knew to be accurate.

114.    As a result of these false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each False Claims Act violation.

### Count II:  Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by Making, Causing, or Using False Records or Statements

115.    The United States re-alleges and incorporates by reference paragraphs 1-110.

116.    The United States seeks relief against the Defendants, jointly and severally, under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

117.    In connection with the foregoing scheme, the Defendants knowingly made, used, or caused to be made or used, false statements and records material to false or fraudulent claims that were paid or approved by the United States.  These statements included false promises on tenders the Defendants submitted to the United States and incorrect weights on invoices.

118.    As a result of the false claims related to these false statements or records, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each False Claims Act violation.

**Count III:  Violations of the False Claims Act, 31 U.S.C. § 3729(7) (through May 19, 2009) and 31 U.S.C. 3729(a)(1)(G)**

119.    The United States re-alleges and incorporates by reference paragraphs 1-110.

120.    The United States seeks relief against the Defendants, jointly and severally, under the False Claims Act, 31 U.S.C. § 3729(a)(7) (for actions through May 19, 2009), and, as amended, 31 U.S.C. § 3729(a)(1)(G) (for actions on or after May 20, 2009).

121.    In connection with the foregoing schemes, the Defendants knowingly made, used, or caused to be made or used false records or statements that were material to their contractual obligations to return overpayments to DOD.

122.    In connection with the foregoing schemes, the Defendants also knowingly made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease their contractual obligations to return overpayments to DOD.

123.    As a result of the unrecovered overpayments related to these false statements

or records, the United States has sustained damages in an amount to be determined at trial,

and is entitled to a civil penalty as required by law for each False Claims Act violation.

### Count IV:  Unjust Enrichment

124.    The United States re-alleges and incorporates by reference paragraphs 1-110.

125.    The Defendants were unjustly enriched from the payments the United States

made for shipments that actually weighed less, and thus cost less, than the Defendants

represented on their invoices.  The circumstances of these overcharges were such that, in

equity and good conscience, the Defendants are liable to account for and pay the total

amount they overcharged, which is to be determined at trial, as well as pre- and post-

judgment interest.

126.    In addition, the Defendants made false statements about their weight

correction practices while tendering offers for freight services to the United States.  The

Defendants were thus unjustly enriched when the United States selected them and paid

them for these services.   The circumstances of these payments were such that, in equity and

good conscience, the Defendants are liable to account for and pay the amount they were

enriched by their contracts and tender agreements with the United States, which is to be

determined at trial, as well as pre- and post-judgment interest.

### Count V:  Payment by Mistake

127.    The United States re-alleges and incorporates by reference paragraphs 1-110.

128.    The United States paid the Defendants for shipments that actually weighed

less, and thus cost less, than the Defendants represented on their invoices.  The United

States paid for these shipments on the mistaken and material belief that it was paying for the

correct weight.  Accordingly, the Defendants are liable to account for and pay the total amount they overcharged the United States, which is to be determined at trial, as well as pre- and post-judgment interest.

### Count VI:  Breach of Contract

129.    The United States re-alleges and incorporates by reference paragraphs 1-110.

130.    The Defendants' contracts (DAMT01-03-D-0044, DAMT01-03-D-0046, W81GYE-06-D-0072, and W81GYE-06-D-0073) required the Defendants to correct any weight discrepancies the Defendants discovered when reweighing shipments and bill the United States accordingly.  Contracts W81GYE-06-D-0072, and W81GYE-06-D-0073 also had a further requirement to inform DOD of any overpayments and "request instructions for disposition of the overpayment."  Likewise, the Defendants failed to comply with the terms of their tender agreements with DOD, which required them to follow the MFTRP. The Defendants failure to adhere to these terms constituted a breach of these contracts.  By reason of the Defendants' breaches, the United States is entitled to recover the damages it suffered, in an amount to be determined at trial, as well as well as pre- and post-judgment interest.

**WHEREFORE**, Plaintiff, the United States of America, prays that judgment be entered in its favor against the Defendants as follows:

A. On Counts I, II, and III, against the Defendants jointly and severally for treble the amount of the United States' damages, in an amount to be established at trial, and all allowable civil penalties, fees, and costs under the False Claims Act;

B. On Count IV, for the amount, to be established at trial, by which the Defendants have been unjustly enriched by the government's payment of their false claims; together with costs and interest;

C. On Count V and VI, for the amount, to be established at trial, of the United States' damages resulting from the Defendants' conduct, together with costs and interest;

D. Equitable relief through an accounting of the proceeds of the fraud and the enforcement of a constructive trust and/or equitable lien upon such proceeds, to the extent that the United States' legal remedy proves inadequate;

E. For pre-judgment interest, post-judgment interest, and any and all other and further relief as the Court may deem just and equitable.

**DEMAND FOR JURY TRIAL**

The United States demands a jury trial in this case.

Respectfully submitted,

Dated: December 12, 2018

JOSEPH H. HUNT
Assistant Attorney General

JAMES P. KENNEDY, JR.
United States Attorney

BY:   s/KATHLEEN LYNCH
Assistant United States Attorney
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
Tel: (716) 843-5830
Kathleen.Lynch@usdoj.gov

BENJAMIN YOUNG
MICHAEL D. GRANSTON
ROBERT MCAULIFFE
Attorneys, United States Department of Justice
Civil Division
Ben Franklin Station
PO Box 261
Washington, DC 20044
Tel:  (202) 616-0291
Fax: (202) 514-7361
Benjamin.S.Young@usdoj.gov

*Attorneys for the United States*