UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------

UNITED STATES OF AMERICA, ex rel.
JAMES HANNUM,

                    Plaintiffs,

            -vs-                            08-CV-0811

YRC FREIGHT, INC.,
ROADWAY EXPRESS INC., and
YELLOW TRANSPORTATION, INC.,

                    Defendants.
--------------------------------------

            Proceedings held before the

      Honorable Michael J. Roemer, Robert H.

      Jackson Courthouse, 2 Niagara Square,

      Buffalo, New York, on August 12, 2019.


      APPEARANCES:

      KATHLEEN LYNCH,
      Assistant United States Attorney,
      BENJAMIN YOUNG,
      U.S. Dept. of Justice Attorney,
      Appearing for Plaintiffs.

      STEPHEN L. HILL, ESQ.,
      SEAN C. CENAWOOD, ESQ.,
      Appearing for Defendants.

      AUDIO RECORDER:  Rosalie A. Zavarella

      TRANSCRIBER:     Michelle L. McLaughlin, RPR,
                       Court Reporter,
                       mclreporter@gmail.com



      (Proceedings recorded by electronic sound
      recording, transcript produced by computer.)

1           THE CLERK:  United States District Court

2   for the Western District of New York is now in

3   session.  The Honorable Michael J. Roemer

4   presiding.

5       We're here on the matter of U.S.A. versus

6   Roadway Express, et al, case number 08-CV-811, for

7   motion hearing.

8       Counsel, please state your name for the record.

9           MS. LYNCH:  Kathleen Lynch and Ben Young

10   on behalf of the United States.

11           MR. HILL:  Stephen Hill and Sean Cenawood

12   on behalf of the defendants, your Honor.

13           THE COURT:  Good afternoon, counsel.

14   We're here for oral argument on the defendants'

15   motions to dismiss and for change of venue.  I have

16   read the papers.  And also when you each start off,

17   if you could give me a little bit of factual

18   background, it might help me out a little bit to

19   understand kind of the whole procedure here as to

20   what happens.

21           MR. HILL:  Your Honor, I haven't appeared

22   in front of you.  May I make the argument from the

23   desk?

24           THE COURT:  You can sit there, and all I

25   ask is you speak into the microphone.  Pull the

1      microphone up.  You can stand at the podium if

2      you're more comfortable.  I draw the line at laying

3      down.  Okay.

4                MR. HILL:  I'll do my best on that last

5      one.

6                THE COURT:  Okay.

7                MR. HILL:  I'll go first, your Honor,

8      since these are our motions.

9                THE COURT:  Okay.

10                MR. HILL:  The background on this, your

11      Honor, is that the defendants are three shippers --

12      pardon me, carriers that provided shipping services

13      to the government.  The basis or the way it would

14      practically work is that the government,

15      particularly the Department of Defense, would

16      indicate to the carriers that they had shipping to

17      be done.

18                THE COURT:  They posted in some kind of

19      like central registry --

20                MR. HILL:  Correct.

21                THE COURT:  -- then a shipper would -- or

22      would they put in a bid for it or --

23                MR. HILL:  No.

24                THE COURT:  You had like open contracts

25      and then you choose which ones you want to take?

1          MR. HILL:  That's right.

2          THE COURT:  And then what if two shippers

3     put in for it at the same time?  Was it like

4     first-come-first-serve type thing?

5          MR. HILL:  I'm not sure that that -- I'm

6     not sure what would happen in that circumstance,

7     your Honor.

8          THE COURT:  Okay.

9          MR. HILL:  The DOD personnel would put

10    together a bill of lading that would include

11    weight.  It would be --

12         THE COURT:  So the carrier somehow

13    communicates to DOD we want that job?

14         MR. HILL:  Right.

15         THE COURT:  Maybe an email or some

16    response on whatever the registry is?

17         MR. HILL:  Right.

18         THE COURT:  And then the government would

19    do up a bill of lading?

20         MR. HILL:  Correct.

21         THE COURT:  Okay.

22         MR. HILL:  The bill of lading is prepared.

23    They show up.  They pick up the shipment.  It is --

24         THE COURT:  Presumably for some supplier

25    of whatever it is that the government's ordered?

1        MR. HILL:  Yeah.  The typical contract,

2    your Honor, was military personnel movings.  So I

3    want to move from base A to base B.

4        THE COURT:  Okay.  So personnel moving

5    from base to base, that was primarily what was

6    involved?

7        MR. HILL:  Right.  There could be other

8    things that could be moved, but --

9        THE COURT:  Been there, done that.

10        MR. HILL:  Okay.  Then it's picked up and

11    it goes to a central terminal where they put

12    together various loads.  It may or may not be

13    reweighed at that time, depending on when the

14    shipment was.  At some point there are --

15        THE COURT:  So it would go to some

16    terminal, like there's one in Tonawanda I think

17    here, isn't there, or --

18        MR. HILL:  Buffalo.

19        THE COURT:  Yeah.

20        MR. HILL:  And it would -- it may or may

21    not be reweighed.  Then it gets -- it gets put on a

22    truck, gets delivered.  Ultimately the information

23    regarding the shipment is put into an electronic

24    computer, an electronic platform that both the

25    shipper and the government share.  The information

1   is provided to them.

2         THE COURT:  So it would be the shipper

3   making the entry, you know, it's been delivered.

4         MR. HILL:  Yeah.

5         THE COURT:  X amount of pounds, whatever.

6         MR. HILL:  Here's the bill of lading.

7         THE COURT:  Okay.

8         MR. HILL:  And then --

9         THE COURT:  Now the weighing, okay, was

10  that -- was that discretional?  That was at the

11  shipper's discretion whether or not to reweigh the

12  load?

13        MR. HILL:  It depends on the date and the

14  contract.  At one point the -- the forklifts that

15  move the freight have scales on them, so they

16  automatically do it.  Early in the process it's up

17  to -- it's the discretion of the shipper.

18  Typically they're going to weigh that to figure out

19  how much weight they've got on it, whether or not

20  they comply with DOT regulations.

21        THE COURT:  Because a truck can only carry

22  so much weight.

23        MR. HILL:  It could only carry so much.

24  They want to know the density for safety reasons.

25  Ping pong balls move differently than bowling balls

1    do.  And then once it's -- the information is

2    entered on the -- the computer system, the billing

3    activity, whether it is the government saying I

4    don't agree with your bill, or movement at

5    administration towards payment is all done on that

6    electronic platform.

7              THE COURT:  Okay.  Let's go back to the

8    weighing again.  So it's -- you don't have to

9    reweigh it as the shipper?

10             MR. HILL:  That's correct.  For purposes

11   of the services you're providing to the carrier you

12   do not.  For purposes --

13             THE COURT:  Services you're providing to

14   the government.

15             MR. HILL:  Correct.

16             THE COURT:  Okay.  You're saying they

17   automatically weigh it when they put it on to make

18   sure they're in compliance with whatever the DOT

19   regulations are?

20             MR. HILL:  That's the typical practice.

21             THE COURT:  Okay.  But they -- they could

22   either choose to go with what's on the original

23   bill of lading, go with that, or they can reweigh

24   it?

25             MR. HILL:  Well, they're going to look at

1    the freight and make sure that they think that the

2    bill of lading is consistent with what they see.

3    They're going to eyeball that.  They have trained

4    personnel to look at it and say that doesn't look

5    like a thousand pounds to me, let's reweigh it.

6    That's before the scales automatically weighed it

7    as a matter of course.

8              THE COURT:  I kind of want to get this

9    down in my head, because it seems to be central to

10   the case about reweighing.  Okay.  So somebody

11   makes a decision that it should be reweighed, and

12   if it's heavier than what the bill of lading says,

13   you amend that and send it in to get more money for

14   the service.

15             MR. HILL:  That's correct.

16             THE COURT:  And if it's lower --

17             MR. HILL:  The allegations are that we did

18   not change -- at a certain point in time we did not

19   change the weight.

20             THE COURT:  When it was lower?

21             MR. HILL:  When it was lower.

22             THE COURT:  Only when it was higher?

23             MR. HILL:  Correct.

24             THE COURT:  Okay.  You can go ahead.

25             MR. HILL:  Okay.  Your Honor, given the

1    fact that the Court has read the pleadings, I'm

2    just going to hit on a couple of points.  In

3    particular I want to talk a little bit about the

4    materiality allegations that are required, as well

5    as touch briefly on the 9(b).

6        Your Honor, the government's materiality

7    allegations are primarily set forth in five

8    paragraphs, paragraphs 9, 104, 105, 107, and 109.

9    The -- for example, in paragraph 9 they say these

10   false claims and false statements were material as

11   they had a natural tendency to influence DOD's

12   decisions to pay the defendants.  They repeat that

13   conclusionary language, which is basically just

14   parroting the definition provided in the statute

15   in -- in paragraph 104.  In paragraph 105 --

16           THE COURT:  Let me get the paragraph 104.

17           MR. HILL:  In paragraph 104 -- as you're

18   looking for it, I'll read it, your Honor.

19           THE COURT:  Sure.

20           MR. HILL:  Under this definition the

21   defendants' false claims and false statements were

22   material as they had a natural tendency to

23   influence DOD's decisions to pay claims, award

24   contracts, accept tender, and not to try to recover

25   overpayments.  In paragraph 105 they say -- they

1  allege that the allegations were capable of

2  influencing DOD's payment decisions.  They repeated

3  that type of language in 107, but interchange the

4  party to say that it was capable of influencing

5  SDDC's decision to approve defendants.  And then,

6  finally, they say in paragraph 109, the defendants'

7  false representations relating to specific

8  shipments were material to the defendants'

9  obligation to return overpayments to DOD.

10      Your Honor, we believe that these factual

11  allegations as set forth in the complaint don't

12  actually allege the requisite facts to establish

13  materiality.  They are conclusionary statements or

14  simply repeat the definition in the statute.  They

15  don't go to the extent that the chief judge of this

16  district required in the Strock decision where he

17  talked about concrete examples that would

18  demonstrate that had the government known, it would

19  have denied these payments.

20      Further, your Honor, on materiality, we believe

21  the Court can take judicial notice of the statutes

22  and the regulations that govern this activity.  The

23  reason that those were important is that they go to

24  the Supreme Court's reasoning and conclusions in

25  Escobar where they say that the government's

1    continued knowledge -- pardon me, continued payment

2    of claims with knowledge of the underlying activity

3    is strong evidence that it's not material.

4         In this instance, your Honor, the relator filed

5    the original qui tam complaint in November of 2008.

6    It's our position that under Escobar this Court

7    could look at -- rather than trying to opine or

8    infer what the government would do, can actually

9    look at what the government actually did here.  And

10   that we think that this is important because, as

11   was again pointed out in Escobar and then again in

12   Strock, there's no allegation that the -- that the

13   government denied a claim, suspended any of the

14   shippers, even went so far as to write a warning

15   letter that would say we're aware of how you're

16   interpreting this.  You're interpreting it

17   incorrectly.  You need to discontinue.  All those

18   remedies were available to the government.

19             THE COURT:  What's your position as to

20   when the government should have reasonably known

21   that and took some kind of action?

22             MR. HILL:  At or near the time the United

23   States Attorney's Office had access to the

24   allegations in the relator's complaint.

25             THE COURT:  So this case was opened

1    in 2015, so -- I'm sorry, what is it?  2008.  So

2    you're saying at least in 2008 they should have

3    known.

4            MR. HILL:  Yes.

5            THE COURT:  And anything they paid after

6    that is their own fault.

7            MR. HILL:  Well, yes.  But most

8    particularly it goes to the Escobar and Strock

9    decisions which say this is evidence that -- that

10   these were not material.  With knowledge of this

11   they continued to do it.  And the point -- the

12   reason we brought up --

13           THE COURT:  Well, I guess -- okay, go

14   ahead.  I almost view those as two different

15   things.  In one instance you're somehow barred

16   because you waited, you sat on your right, you

17   didn't do anything, which I guess would be a

18   defense, right, to the charges.  Or there's lack of

19   materiality.

20      I have trouble, to be honest with you, with the

21   lack of materiality.  I mean, you know, it's a

22   significant place, for instance, between what would

23   have been charged had the true weight been reported

24   as opposed to what weight was reported and what was

25   used.  I mean, I'm looking at in particular Exhibit

1    A, the very first entry has the actual weight of

2    the shipment was 140 pounds and the billed weight

3    was 6,000 pounds.  That's a 98 percent change

4    difference between the actual weight and the real

5    weight.  Isn't that on its face material, that, you

6    know, if they would have known that they were

7    getting billed 98 percent higher than what the

8    actual work was, that that would have made a

9    difference in what they did?

10             MR. HILL:  Well, your Honor, to speak

11   specifically to what the Supreme Court said, they

12   said that knowledge and inaction by the court is

13   strong evidence, regardless of the amount --

14             THE COURT:  By the government, I think,

15   right?

16             MR. HILL:  Yes.

17             THE COURT:  You said the court.

18             MR. HILL:  Oh, pardon me.

19             THE COURT:  I thought I did something

20   wrong.

21             MR. HILL:  No, no.  No.  Regardless of the

22   amount, the Supreme Court didn't say well, if you

23   reach a certain threshold of how much is at issue,

24   that's material.  What they said was we want and we

25   require the party that is seeking recovery under

1   the False Claims Act to plead evidence or plead

2   facts that would demonstrate that this would be

3   material and that the government would, in fact,

4   take action.

5             THE COURT:  Yeah, but didn't -- wasn't --

6   in Escobar weren't they talking about failure to

7   comply with certain regulations that may or may not

8   have been relevant to whatever the determination of

9   pay the claim was?  Say, for instance, there's a

10  regulation that says your trucks have to have a

11  first aid kit in them and they don't.  Would that

12  be material to whether or not you get paid?

13  Probably not.

14     But this is -- if you're overcharging -- if the

15  actual contract that you entered into you're

16  overcharging the government, isn't that on its face

17  material?  I'm having trouble with it.  I'm

18  wrestling with it.

19            MR. HILL:  No.  Your Honor, there's no

20  precedence cited by the government that on its face

21  failure to pay -- or, pardon me, failure to live up

22  to the claim is material.  And going back to your

23  question about Escobar, the Escobar language was

24  quite clear that this particular instance we're

25  dealing with today is relevant.  They said in the

1    situation where the claim is based on either

2    statutory, regulatory, or contractual failure, then

3    it has to be material.  And the United States'

4    claim here is the contract says you interpret your

5    obligation to weigh and charge according to this

6    specific language.  So it's right on point with

7    Escobar.

8        I get the Court's point about the sort of issue

9    that might be involved.  But the court was quite

10   clear that it was talking about this particular

11   circumstance, because it's a contractual dispute.

12   They interpret what we're obligated to do one way.

13   We interpreted it a different way.

14            THE COURT:  But it goes to the heart of

15   the contract, right, the price that's being

16   charged.  You're supposed to do a task and get paid

17   a certain amount of money.  They're alleging you

18   didn't do the task, so you shouldn't get paid that

19   amount of money.  Doesn't that go right to the

20   heart of it?

21            MR. HILL:  Well, it is a central issue,

22   but the courts have said -- whether it's Escobar or

23   the Western District of New York have said you have

24   to allege facts and circumstances that would make

25   it clear the government would deny this claim.  Our

1    argument is there are no such allegations in those

2    five paragraphs.  They've not done that.  They've

3    not alleged that.

4         Further, your Honor, we think that the Court,

5    this Court --

6              THE COURT:  You think if the government

7    knew they were paying 98 percent more than what

8    they're supposed to pay, you think they would have

9    paid it anyways?  It wouldn't have made a

10   difference to them?

11             MR. HILL:  By their conduct, your Honor,

12   they could have said to the defendants the day

13   after they received that qui tam, look, here's your

14   warning letter.  You're not allowed to do it this

15   way.  They didn't do that, your Honor.  They

16   further -- they could have suspended them, they

17   could have terminated, they could have picked up

18   the phone and said your contractual interpretation

19   is not the right way to do it.  We're not going to

20   pay this.  They could have done all those things.

21   They had knowledge as of November of 2008.

22        Materiality would require the government to say

23   this Court can look at specific allegations either

24   similar circumstances or other -- or specific

25   instances where we said to the defendants before

1    the Court today, don't do this.  Courts have said

2    failure to do -- failure to exercise your remedies

3    and continue paying is evidence that it's not

4    material.  And our point is the Court can either --

5              THE COURT:  I guess I'm a little bit --

6    we're in a motion to dismiss phase.

7              MR. HILL:  Right.

8              THE COURT:  We're not in the summary

9    judgment phase or the trial phase.  You're talking

10   about well, this is evidence of this or evidence of

11   that.  All they have to do is allege it at this

12   point.  There's no requirement that they produce

13   actual evidence of any of that.

14             MR. HILL:  If I said that, your Honor,

15   that's not what I meant to say.  What I meant to

16   say was in those five paragraphs they -- that I

17   went through with you, they have not alleged any

18   fact that could be taken as true today in a motion

19   to dismiss that gives the Court the basis to find

20   that these failures were material.

21        We also are arguing that the Court is allowed

22   in a motion to dismiss to take judicial notice.  We

23   argue that it could take judicial notice of two

24   things.  It could take judicial notice of the day

25   this case was filed and the government had

1    knowledge of the approach that was taken on these

2    contracts.  We also argue that the Court could take

3    judicial knowledge of all of the means required of

4    the Department of Defense to communicate that it

5    didn't agree with the bill.

6         THE COURT:  But they didn't know they

7    didn't agree because you weighed it, and only you

8    knew it was 98 percent lower than what it should

9    have been.

10        MR. HILL:  Two things about that, your

11   Honor.  The first is we've called the Court's

12   attention to the fact that by law, by regulation,

13   the GSA does an audit including the claim.  At that

14   time they would have been able to say for all of --

15   because really what we're arguing about is not the

16   bills where the weight was increased.  We're

17   arguing about the issue where the weight was

18   decreased.  So it would be very easy for the

19   government as of November 2008, being aware of

20   these allegations, to have gone to GSA and said, in

21   your audits, did you find any instance where the

22   weight did not change?  And they could have gone in

23   and looked at those and said --

24        THE COURT:  That -- that -- that data

25   would have been there?

1          MR. HILL:  Yes.

2          THE COURT:  You guys kept track of which

3     ones were lowered that you charged full price for?

4     You had that in a database somewhere?

5          MR. HILL:  At the time -- well, let me

6     back up.  Exhibit A, which has been included, is

7     simply data that has been provided by the

8     defendants to the government.  At the time -- that

9     data is not necessarily the claim.  There are a lot

10    of other factors besides just the weight that goes

11    into --

12         THE COURT:  Basically it's the weight and

13    the distance, right?  Those are the two biggest

14    factors?

15         MR. HILL:  The density, the immediacy of

16    how soon it will be delivered, where it will be

17    delivered, all those are factors.  But, at the

18    time, all of that data would have been available to

19    both the defendants and the government.

20         THE COURT:  So you're carriers, you kept

21    track of every time the weight was lower than what

22    it was alleged to be?

23         MR. HILL:  Yes.

24         THE COURT:  And you had that freely

25    available to the GSA when they did an audit?

1          MR. HILL:  They could have gotten that

2     information.

3          THE COURT:  Okay.

4          MR. HILL:  And it's our position as to

5     materiality that they're -- by court precedent

6     they're obligated to do that.

7          Briefly, your Honor, two other points to cover

8     on the 9(b) portion of the -- of the motion.  The

9     first has to do with the government's failure to

10     plead with specificity the actual claims.  There

11     are at least two problems with those claims.  The

12     first is the -- any party under a 9(b) review for

13     fraud is obligated to spell out the speaker, the

14     person, the entity making the claim, as well as the

15     claim itself.  As the Court has pointed out, the

16     government in this case does not specifically say

17     which carrier was responsible for which shipment

18     that is on Exhibit A.  The -- what they could have

19     done was to identify a particular carrier and a

20     particular claim.  They don't do that.  And by not

21     doing that, they have failed to meet the

22     requirement for specificity.

23          Now, the government's argument in its

24     pleadings, your Honor, is that this information was

25     readily available to only the defendants and not

1    the government.  In fact, we would ask the Court to

2    take judicial notice again of the fact that they

3    had equal access per the GSA audit process.  In

4    realtime they had access to that information.

5         They've cited the Chorches decision, your

6    Honor, from the Second Circuit which I think is

7    different for two reasons.  First, the

8    whistleblower in that case had alleged in great

9    detail how the whistleblower was unable to get

10   access to the information.  That's not the case we

11   have here.  Second, in --

12             THE COURT:  You mean that they haven't

13   alleged it?

14             MR. HILL:  Yes.  And in Chorches the

15   Second Circuit looking at that said we're going to

16   allow you to have a relaxed 9(b) standard here,

17   because you have alleged that you are not -- that

18   you can't get to the information.  That's not the

19   case here.  And, your Honor, the case was filed

20   in 2008, and then the government had a ten-year

21   investigation.  At any time they could have gone to

22   their own databases, they could have asked for the

23   information.  They had equal access through the GSA

24   process.  This is not the Chorches situation where

25   they have alleged and so the Court has to agree

1    with the facts that are the basis for a limited or

2    relaxed standard.

3         Also, your Honor, under 9(b) we appreciate and

4    understand that the parties' obligation to plead

5    the scienter or the knowing requirement is a

6    general one.  But as we pointed out in our

7    pleadings, there is no allegation in the complaint

8    that, first of all, says that the defendants knew

9    when they were submitting the bills that they were

10   false.  There's no such allegation.  There are

11   conclusionary statements, your Honor, where they

12   use the phrase knowing, saying defendants knowingly

13   submitted.  But there is no factual basis to say

14   that this defendant knew it was false.

15        Second, we get into the reckless indifference

16   standard as a substitute for the actual knowledge

17   of the falsity.  We cite for the Court's attention

18   the Safeco decision that talks about reckless

19   indifference and how it's not reckless indifference

20   when there is a reasonable interpretation or an

21   objective interpretation of contract.

22        Finally, on the scienter, your Honor, they are

23   pleading --

24             THE COURT:  Is that a -- is that a

25   pleading deficit?

1          MR. HILL:  Yes.

2          THE COURT:  You had -- they say well, you

3    should have told us it was less than that.  And you

4    say well, that's not the way we read the

5    regulation.  That's -- that's a pleading issue or

6    that's a defense issue, a proof issue, later on

7    down the line?

8          MR. HILL:  So, it's a good question, your

9    Honor.  The standard at 9(b) is that you at least

10   plead some facts that the Court can draw an

11   inference of fraud.  Our argument is that they have

12   not individually -- they've said as a group

13   defendants know -- knew that they were submitting

14   improper claims.  Our argument is you have to go

15   beyond that at the pleading stage and specifically

16   argue facts related to each defendant that would

17   allow you to draw an inference of fraud in looking

18   for purposes of deciding whether or not they met

19   their pleading requirement.

20       Our argument is that, first of all, they've not

21   made any individual allegations.  Second, our

22   argument is they've not provided any facts to the

23   Court from which it could draw an inference of

24   fraud.  There's no allegations of expressed

25   knowledge, and we would argue there's no

1    allegations of facts that would let the Court infer

2    reckless indifference.

3        THE COURT:  Isn't the bottom line to all

4    this that they have to make allegations that are

5    clear as to what you're being accused of?  I mean,

6    sometimes we get cases in here they're very

7    complicated cases, they're Ponzi schemes, there are

8    all kinds of different things that they do.  This

9    is pretty straightforward.  I mean, you know, they

10   hired you to haul X amount of weight, you weighed

11   it, it was less than that, but you charged them for

12   X amount rather than the lower weight.  I mean,

13   it's not a hard thing to understand or to figure

14   out.  It's not complicated.  Am I missing

15   something?

16       MR. HILL:  No, your Honor, we would agree

17   with that.  But the distinction, the sort of --

18   where you go just a little bit further is I think,

19   with due respect, your Honor, you described an

20   analysis that would be done on a breach of

21   contract.  The additional pleading requirements

22   when you get into fraud include you have to allege

23   who submitted the fraud.  They haven't done that

24   here.

25       THE COURT:  Let's stop there for -- okay.

1    You said Exhibit A.  Like they don't list who the

2    carrier was.  Is there a possibility that Exhibit A

3    has carriers that aren't Roadway or Yellow?

4             MR. HILL:  I don't know.  I didn't prepare

5    the exhibit.  But what I do know is they didn't say

6    what carrier was responsible for that particular

7    shipment.

8             THE COURT:  I guess two things.  Does it

9    matter at this point, because now you're combined.

10   You're on the hook for either one.  And two, can

11   they fix that?  If you needed that, could they go

12   back and just list each carrier for each -- I guess

13   they deliver them by delivery date they got them

14   listed.

15            MR. HILL:  Well, if the Court were to

16   allow to amend, I think that that's an obligation

17   they'd have to meet.

18            THE COURT:  Okay.

19            MR. HILL:  But the other thing, your

20   Honor, is they've not -- Exhibit A is not the

21   claims.  They're the weight difference, but they're

22   not the claims.  And the I believe --

23            THE COURT:  It says Exhibit A, examples of

24   defendants' false claims.  I mean, that's what

25   they're asserting are the false claims.

1          MR. HILL:  But they're not -- for example,

2    where is the bill of lading number for -- you

3    picked the first one, your Honor.  Where is the

4    information related to claim was submitted on this

5    day, the bill of lading was number was X, the party

6    shipping this was X.  They don't provide any of

7    that.  And I think they're required to articulate

8    with particularity those --

9          THE COURT:  For each claim?

10          MR. HILL:  For each claim.

11          THE COURT:  Okay.

12          MR. HILL:  And to finish, your Honor,

13    the -- on the knowing requirement, the allegations

14    in the complaint are that there were a couple of

15    instances where individuals within the organization

16    were concerned about the business ramifications of

17    the reweigh policy.  Your Honor, take those facts

18    as true, that's fine.  But those allegations don't

19    create an inference for this Court that the

20    individuals who knew that knew that that specific

21    contract and how they were executing and

22    administering that they were fraudulently doing

23    that.  That's not the same thing, and they had an

24    opportunity to depose people and ask them did you

25    think that this was wrong.  There's no such

1        allegations in the complaint.

2            And we believe that the controlling precedent

3        would require them to plead not that there was

4        concerns among various individuals that their

5        clients might not -- or customers might not like

6        this interpretation.  We believe they have to plead

7        that either the individuals knew and why they knew

8        that this was false or fraudulent.  And simply

9        citing that there may be business consequences is

10       not enough to allege even generally the sufficient

11       knowing nature of the claims.

12           And on that point, your Honor, we did cite a

13       Southern District decision, the Colucci decision,

14       that said taking advantage of a contractual

15       interpretation is not enough for a false claim,

16       that it has to be something more than that.  And we

17       believe that the Court is right, there is a

18       difference of opinion how to interpret the

19       obligation for the negative reweighs.  But simply

20       taking advantage -- it's alleged that they're

21       taking advantage of their interpretation under the

22       Colucci decision was not enough.

23                THE COURT:  That was on a motion to

24       dismiss?

25                MR. HILL:  Yes.

1          THE COURT:  Mr. Young?

2          MR. YOUNG:  Good afternoon, your Honor.

3          THE COURT:  By the way, we're going to --

4     we'll do the change of venue after we do this.

5          MR. HILL:  Okay.

6          MR. YOUNG:  Your Honor, the defendants'

7     motion should fail because --

8          THE COURT:  Could you just do me a favor

9     and pull the microphone a little bit closer?  We

10    don't have the luxury of a court reporter.  This is

11    the low-rent district down here, so we record

12    everything, so you got to speak into the --

13         MR. YOUNG:  This all seems very high rent

14    to me, your Honor.  Is this okay?

15         THE COURT:  Yep.

16         MR. YOUNG:  Your Honor, the defendants'

17    motion should fail because, as I think the Court

18    seems to recognize, the United States has alleged a

19    textbook case of fraud.  And it's amply supported

20    by detailed facts throughout the complaint as well

21    as the overwhelming weight of the case law.

22        The United States has alleged in some detail

23    the genesis and implementation of the defendants'

24    scheme to charge their customers, including the

25    Department of Defense, for inflated weights.  The

1    scheme is that simple.  It does not require a

2    lengthy analysis of various Department of Defense

3    rules.  It is did you bill the correct weight on

4    the invoice?  And they did not.  They billed for a

5    higher weight than they knew to be true.  The

6    United States has also alleged that the

7    defendants --

8              THE COURT:  Well, what gets me hung up a

9    lot in this case is the fact that their reweigh was

10   discretionary.  They didn't have to reweigh it.

11   They could have rolled the dice and in some cases

12   they would have made out and in some cases they

13   would have lost.  But I -- I mean, there is no --

14   there was no -- apparently no regulation, no

15   contractual obligation to reweigh.

16             MR. YOUNG:  That's correct, your Honor.

17             THE COURT:  So you're saying well, they

18   did, and since they did and they knew some of them

19   were lower, then they should have told us.

20   That's -- that might be the moral and correct thing

21   to do.  But what was the requirement that they do

22   that?

23             MR. YOUNG:  Well, your Honor, the

24   defendants were required under the prevailing

25   Department of Defense transportation rules which --

1          THE COURT:  Okay.  Which rule you got

2     there that says that?

3          MR. YOUNG:  So the MFTRP is the governing

4     rules for these transportations.

5          THE COURT:  Right.

6          MR. YOUNG:  And as the parties have

7     discussed in the various briefs, the MFTRP changed

8     over time.

9          THE COURT:  It was amended, what, in 2009?

10          MR. YOUNG:  It was amended in 2009, that's

11     correct, your Honor.

12          THE COURT:  To try to get rid of whatever

13     ambiguity there was as to whether or not they

14     should be reweighed and whether or not you can

15     charge for a higher, not a lower, right?

16          MR. YOUNG:  Right, your Honor.  So in --

17          THE COURT:  Is that right?  Is that what

18     happened in 2009?

19          MR. YOUNG:  It was amended in that way

20     in 2013.

21          THE COURT:  But there was an attempt

22     in 2009 to do it, right?  Or am I wrong?

23          MR. YOUNG:  No, your Honor.  In 2009 the

24     MFTRP was changed.  So I'm -- prior to 2009 the

25     MFTRP had a shortened claim requirement which was

1    that if a carrier independently decided to reweigh

2    a shipment, and there was a discrepancy, you know,

3    if they found a discrepancy to the weight listed in

4    the bill of lading, they had to inform the

5    government.  That requirement --

6                THE COURT:  Did it say higher or lower?

7                MR. YOUNG:  It did not say higher or

8    lower.  It said when the carrier discovers a

9    discrepancy.  It did not specify higher or lower.

10   Then in 2009 the MFTRP was amended, and that rule

11   was --

12               THE COURT:  Oh, that's what it said before

13   the 2009?

14               MR. YOUNG:  That's what it said before

15   2009.

16               THE COURT:  All right.

17               MR. YOUNG:  So when the defendants began

18   their, as we've alleged, fraudulent reweigh

19   practices, that was the rule.  The defendants

20   have -- in their briefings have claimed that

21   the 2009 amendment somehow created some ambiguity,

22   that that would allow for the Court to find that

23   they reasonably thought that what they were doing

24   was okay within the rule.  But even that 2009

25   amendment still has the same requirement, where, if

1     the defendants independently decide to reweigh a

2     shipment and discover a discrepancy, they are

3     obligated to report that to the government.

4         Now, the 2009 rule did have some additional

5     notification requirements.  It flushed out the

6     notification requirements a little bit more, and it

7     also had a line saying that if the defendants

8     wanted to get paid for extra weight, then they had

9     to meet those requirements.  But there's -- the

10    rule is still clear, if there's a discrepancy --

11              THE COURT:  Did it say anything that if

12    it's lower you have to reduce your bill whatever it

13    was lower?

14              MR. YOUNG:  It did not speak to that, your

15    Honor.

16              THE COURT:  Okay.

17              MR. YOUNG:  But the rule is still clear

18    that if there's a discrepancy, you have to notify

19    the government.  And there's nothing in the rule to

20    suggest that the government was okay with being

21    overcharged.  In fact, the interpretation the

22    defendants are now claiming that they had at the

23    time is -- to the extent that there's any ambiguity

24    in the rule, it's just not reasonable.

25        The notion that the government would have all

1    of a sudden -- in 2009 the Department of Defense

2    would say it's okay, you can overcharge us.  We

3    only want to know when we can pay you more money.

4    It makes no sense.  And the defendants haven't --

5    there's nothing in the four corners of the

6    complaint --

7            THE COURT:  You say that, but what you

8    just told me was okay, if they independently

9    reweigh it, they have to report to you any

10   discrepancy.  And then it went on to say if -- if

11   the weight was higher, to go ahead and make a

12   request.  But it didn't say if it was lower, go

13   back and reduce your charge.

14           MR. YOUNG:  Well, your Honor, it stated

15   that if -- in order to get paid for extra weight,

16   the defendants had to meet all the various

17   requirements.  It would not have made -- the

18   corresponding language would not have made really

19   much sense.  The government would not say in order

20   for us to pay you extra weight, you have to check

21   all these boxes.  That's just as a matter --

22           THE COURT:  That's what it said.  That's

23   what you told me it said.

24           MR. YOUNG:  Well, that's what it said for

25   the -- for the positive -- for the discrepancies in

1    the defendants' favor, the government said you have

2    to --

3              THE COURT:  Here's what you got to do.

4              MR. YOUNG:  Here's what you have to do.

5              THE COURT:  But it was silent as to --

6              MR. YOUNG:  But it was silent as to

7    what -- that's correct, your Honor.  So it would

8    not have -- you know, again --

9              THE COURT:  You don't even say it might be

10   reasonable and all that.  It didn't say it.

11             MR. YOUNG:  That's true, your Honor.  But

12   we are at the motion to dismiss stage.  All

13   inferences are to be taken in the government's

14   favor.  And in order for the defendants to make

15   the -- and this speaks to their scienter argument.

16   In order for them to make that argument

17   successfully -- first of all, they're relying on

18   Safeco which has never been applied in the False

19   Claims Act context in this circuit.  I don't think

20   they've applied -- I don't think they've applied to

21   any cases from the Second Circuit Court of Appeals

22   that have -- really speak to the argument they're

23   making.

24        But even if it did apply, even if Safeco did

25   apply and in 2016 the Supreme Court actually in the

1     Halo Electronics decision indicated that they

2     pulled back a bit from Safeco and they said that

3     culpability should be measured against knowledge at

4     the time of the challenged conduct.  So it's this

5     idea that you can't after the fact come up with a

6     plausible interpretation and then not be culpable.

7          But assuming Safeco applies, there are

8     essentially three requirements.  The language has

9     to be ambiguous.  We've alleged that it was not,

10    that it was clear.  The defendants' interpretation

11    has to be reasonable.  As we've explained in our

12    briefings -- there's nothing in the complaint to

13    indicate that the defendants' interpretation --

14    first, that they actually had this interpretation

15    at the time.  To the contrary, we allege in the

16    complaint that in 2010 the defendants understood

17    that MFTRP required the government to pay for the

18    correct weight.  But there's nothing to suggest

19    that the defendants' interpretation was reasonable.

20    And then lastly, the issue is whether the

21    defendants were warned away somehow from the

22    interpretation.

23              THE COURT:  Were what away?

24              MR. YOUNG:  I'm sorry, warned away.

25              THE COURT:  Warn, W-A-R-N-E-D?

 1          MR. YOUNG:  Yes, your Honor.

 2          THE COURT:  Okay.

 3          MR. YOUNG:  So there was some sort of

 4   information outside the rule that would have given

 5   the parties some notice that their interpretation

 6   was incorrect.  There's --

 7          THE COURT:  Just out of curiosity, did the

 8   change in the regulation come up with this qui tam

 9   action?

10          MR. YOUNG:  Your Honor --

11          THE COURT:  You don't know?

12          MR. YOUNG:  I don't know, your Honor.

13          THE COURT:  Go ahead.

14          MR. YOUNG:  But there's nothing in the

15   record that really speaks to whether the defendants

16   were warned away or not.  So, at this stage to

17   dismiss --

18          THE COURT:  Okay.  What happened in 2013?

19          MR. YOUNG:  In 2013 the Department of

20   Defense further amended the rule to state that

21   whether the discrepancy was higher or lower,

22   carriers still had to notify the government when

23   they independently reweighed a shipment and found

24   it to --

25          THE COURT:  Say that one more time, I'm

1  sorry.

2          MR. YOUNG:  In 2013 the Department of

3  Defense -- the rule was amended so that whether --

4  to specifically state whether the weight

5  discrepancy was higher or lower, carriers still had

6  to provide notice to the government.

7          THE COURT:  So at that point they provided

8  clarification, you had to report a discrepancy

9  higher or lower.

10          MR. YOUNG:  That's correct, your Honor.

11          THE COURT:  Okay.  Did it say anything to

12  the effect that you had to amend your bill

13  accordingly or anything like that?

14          MR. YOUNG:  Yes.  I mean, the -- the gist

15  of the rule was that this was to correct the

16  billing so that the government was only paying for

17  the actual weight.

18      But again, to get back to the point, the

19  defendants really should only be able to prevail on

20  the knowledge side here after there has been

21  some -- you know, assuming that Safeco applies,

22  which we would say it does not, assuming that the

23  rule was ambiguous, which we would say it is not,

24  assuming their interpretation was reasonable, which

25  we would say it was not, the defendant would still

1  have to essentially -- there would have to be some

2  evidence in the record that they were not warned

3  away somehow from the interpretation they claimed

4  to have had.  And we're just not there yet, your

5  Honor.  And also --

6          THE COURT:  Well, you say there would have

7  to be evidence in the record that they weren't

8  warned away.  I guess, one, we're on their motion

9  to dismiss your complaint.  That seems to be on

10  their end.  And two, it's like proving a negative I

11  guess.

12          MR. YOUNG:  That's correct, your Honor.

13          THE COURT:  To show you weren't warned

14  away from something.

15          MR. YOUNG:  That's -- that's fair.  But my

16  point, your Honor, is that there has been no --

17  whether they were warned away or not is uncertain

18  at this point.  There's been no discovery on that

19  issue.  It's -- the record is just not developed,

20  so it would not be appropriate -- it would not be

21  appropriate to, you know, dismiss this case on that

22  basis.

23          THE COURT:  I guess one of the biggest

24  questions I want to ask you is where were you?

25  What was going on?  How come it took ten years to

1  get this together and to decide to intervene in the

2  case?

3        MR. YOUNG:  It's a good question, your

4  Honor.  So, just to give you a history of the case,

5  and I'll spare the Court my biographic details in

6  what I was doing at the time, because I was not

7  practicing law when the case was filed.

8     The qui tam was filed in November of 2008.  It

9  was filed generally.  It was not just filed with

10  respect to the Department of Defense.  It was filed

11  government-wide.  So this was not -- this was a

12  substantial undertaking for the government to take,

13  you know, all the different government agencies

14  that ship freight or contract to ship freight.  It

15  was -- it was not as clear-cut as we now.

16        THE COURT:  The initial qui tam action --

17  I don't know yet if it's realtor or relator. I've

18  heard it pronounced both ways.

19        MR. YOUNG:  Relator, your Honor.

20        THE COURT:  Okay.  Whether or not -- that

21  wasn't specific to DOD shipments, that was just in

22  general, I wanted the government to know this is

23  what they're doing on government contracts, no

24  matter who the source was.

25        MR. YOUNG:  That's correct.  The

1    allegation was when the United States uses the

2    defendants -- when any agency of the United States

3    uses the defendants as a freight carrier, this

4    fraud is happening.

5              THE COURT:  But this case is only about

6    the DOD.

7              MR. YOUNG:  That's correct, your Honor.

8              THE COURT:  Okay.

9              MR. YOUNG:  There was some investigation.

10   There was some back and forth with the defendants.

11   Based on correspondence from the defendants, the

12   parties were discussing settlement as early as

13   September 2010.  And then in -- it was only in

14   November 2012 that the defendants provided the

15   negative reweigh information to the government.  So

16   the government only -- at the earliest the

17   government could have arguably known the scope of

18   the defendants' false claims as well as the, you

19   know, what sort of discrepancies are we talking

20   about?  Are we talking about was it 5 pounds

21   overweight or was it thousands of pound overweight?

22   The earliest the government knew that was November

23   of 2012.

24       And in November 2012 was when the Department of

25   Defense began the process to amend the rule in

1    question.  So one of the things the defendants

2    have --

3           THE COURT:  November 2012 did you send

4    them a letter or anything saying hey, knock it off.

5    You're not doing it correctly or --

6           MR. YOUNG:  The record's not clear as to

7    what administrative action the Department of

8    Defense took with respect to the defendants.  But

9    we'll say it's important to remember in -- the

10   defendants are making this argument in the context

11   of materiality.  And in doing so, they've really

12   not stated correctly what the rule is for

13   materiality.

14       In Escobar the Supreme Court clearly outlined

15   two different ways materiality could be satisfied.

16   The first way is would a reasonable person consider

17   this conduct to be important.  And here a

18   reasonable person would consider being overcharged

19   important.  A reasonable person would consider

20   doing business with a company that habitually

21   cheats its customers as important.  There's really

22   no need to get into, you know, what the government

23   would have done had it known.  That question is

24   just not -- there's no need to reach that question,

25   your Honor.

1      But the Supreme Court did also make clear that

2  to the extent the government's actual conduct is at

3  issue, it -- it -- that conduct has to hinge on

4  when the government has actual knowledge.  And the

5  defendants' position that the government had actual

6  knowledge when it received allegations in a qui tam

7  is just not correct.  The government doesn't

8  actually know something has happened when it

9  receives qui tam allegations.  It has allegations

10  that something has happened.  It has an obligation

11  to investigate them and try to get to the bottom of

12  it.  You know, if -- if the Department of

13  Defense --

14           THE COURT:  Okay.  I get that from 2008 to

15  November 2012.  And then what about after

16  November 2012?

17           MR. YOUNG:  After November 2012 the

18  parties -- the United States continued to

19  investigate.  The United States received I believe

20  40,000 pages of documents in November of 2013.

21  Obviously there are -- you know, for the False

22  Claims Act purposes just knowing false claims have

23  been submitted is not the end of the government's

24  investigation.  We also check to see whether we

25  believe we can satisfy scienter and materiality.

1      And then the parties were in settlement discussions

2      from 2015 to 2018.  Those settlement discussions

3      broke down, and the United States moved to

4      intervene accordingly.

5          We're also -- if I can speak quickly about the

6      defendants -- the defendants have stated that --

7      also that there were audits that the government

8      could have taken that would have essentially

9      informed the government of what was going on.  And

10     all of the different measures the defendants cite

11     to in their filings, none of them would have --

12     none of them call for the government actually

13     reweighing shipments or conducting its own weight

14     check, which is really what would have had to

15     happen here.  As a practical matter, when the

16     government receives a shipment, you know, when the

17     defendants --

18                 THE COURT:  Well, there would be no way to

19     reweigh the shipment.  The shipment is gone.

20                 MR. YOUNG:  That's correct.  It's been

21     unloaded, and so --

22                 THE COURT:  Where -- in Exhibit A where do

23     the actual weights come from?

24                 MR. YOUNG:  The actual weights in Exhibit

25     A -- the defendants in 2012 they provided the

1    government with essentially a large spreadsheet of

2    information.  They told us that they did not

3    capture -- contrary to what Mr. Hill said today,

4    that they did not capture the negative reweigh

5    information prior to 2010.  So the contention that

6    the government could have just asked them for this

7    information is contrary to what we've been told by

8    the defendants.

9        Our understanding is they only -- and as we've

10   pled is that they only captured and retained the

11   positive information.  And, in fact, as we pled,

12   the defendants actually took steps to hide these

13   negative reweighs in their own records.  But

14   notwithstanding that --

15          THE COURT:  Do you allege that in the

16   complaint?

17          MR. YOUNG:  Yes, we did, your Honor.  We

18   alleged it in -- it is in -- one instance of it is

19   in -- excuse me, your Honor.  I'm sorry, your

20   Honor.  We alleged it in paragraphs -- essentially

21   between paragraphs 83 and 89.  For example, in

22   paragraph 86 we allege that in -- according to an

23   internal email from June 2009 YRC programmed its

24   computer system so that negative reweigh results

25   would never show up in the mainframe to be

1    recorded.

2        And again, it was not just the negative reweigh

3    results were not retained.  It was that -- rather

4    than, you know --

5            THE COURT:  This would seem to indicate

6    that they were purposely not retained, correct?

7    That's what you're alleging.

8            MR. YOUNG:  We're alleging that the

9    defendants -- we're not alleging the defendants

10   purposefully destroyed the records.  We are

11   alleging that the defendants intentionally took

12   actions to hide --

13           THE COURT:  It doesn't say they destroyed

14   them.  It said they just didn't record them.

15           MR. YOUNG:  Well, that's right.  In

16   paragraph 84 we say that the defendants did not

17   keep records of the negative reweigh corrections.

18           THE COURT:  Right.

19           MR. YOUNG:  And again, that matches their

20   representations to us, which is that essentially

21   they did not have this information to share with

22   the government at the outset of the investigation.

23           THE COURT:  But they did after 2010.

24           MR. YOUNG:  In 2000 -- in November 2012

25   they -- at that point they did share that

1    information with respect to the Department of

2    Defense.

3              THE COURT:  Well, Exhibit A has 2010

4    information of actual weights.

5              MR. YOUNG:  Correct.  Correct, your Honor.

6    They went back to 2010.  So in 2012 -- I'm sorry,

7    in 2012 they didn't share it prospectively.  They

8    didn't say this is what we're doing from now on.

9    In 2012 they said essentially this is what we've

10   been doing for the last 20 months.  And so it was a

11   spreadsheet of shipments that had already been

12   delivered.

13             THE COURT:  I'm sorry, I'm a little

14   confused, because you said they didn't keep those

15   records.  But then they were able to go back

16   to 2010 and tell you what the actual weights were.

17   So somewhere somebody had the information.

18             MR. YOUNG:  Right.  Correct, your Honor.

19   So prior to 2010 the defendants did not keep the

20   records.  In 2010 they started to keep the records.

21   In 2012 they shared some of that information with

22   the government.  That's -- that is the timeline.

23   And that information that they shared went back to

24   I think June 2010.

25             THE COURT:  Okay.  This information that

1    you have in Exhibit A, is that all the information

2    there is?  I mean, did you use all the information?

3            MR. YOUNG:  We -- that's -- those are the

4    main points, your Honor.  The defendant did provide

5    us with --

6            THE COURT:  Something that happened

7    in 2007, could you prove it right now?

8            MR. YOUNG:  We could prove that the

9    defendants -- your Honor, we could prove that the

10   defendants were doing the exact same -- had the

11   exact same fraudulent reweigh practices.  Whether

12   we could go back --

13           THE COURT:  But you couldn't get in any

14   specificity, what -- what date, where it happened,

15   what the weight was, what the actual weight was,

16   what the weight charged, you don't have that

17   information?

18           MR. YOUNG:  We don't have that -- no, your

19   Honor, we don't have that information today because

20   the defendant's destroyed it.  We cannot --

21           THE COURT:  Well, let's be careful.  You

22   say they destroyed it.  Did they destroy it or did

23   they not record it?  I view those as two different

24   things.

25           MR. YOUNG:  Fair enough, your Honor.  The

1      defendants at a minimum did not record it.  I can't

2      speak as to whether it was affirmatively destroyed

3      or not.

4              THE COURT:  Okay.  Say motion to dismiss

5      denied, we go through the case, you get to trial.

6      How are you going to prove anything that happened

7      before 2010 with regard to damages?

8              MR. YOUNG:  Well, your Honor, one

9      option -- and we have not decided yet as to, you

10     know, what tact we would take at that juncture, but

11     one option would be to say essentially, as we've

12     alleged, the defendants provided us with 13,000

13     false claims in the 2010 to 2012 period.  And one

14     thing we could do would be to take that information

15     and essentially, for damages purposes, extrapolate

16     it out and say, you know, there were X number of

17     false claims we submitted per month.  These false

18     claims, you know, on average each one cost the

19     government Y dollars.  Taking that information and

20     applying it --

21             THE COURT:  If you added up all the

22     monetary, what's the damages in Exhibit A?

23             MR. YOUNG:  Your Honor --

24             THE COURT:  What does that add up to?  How

25     much money are we talking about?

1          MR. YOUNG:  We can't speak today as to how

2     much money we're talking about with respect to

3     Exhibit A.  One of the reasons is the defendants,

4     when they provided us this information, they didn't

5     provide, for instance, the commercial -- the bill

6     of lading numbers.  So it's not so simple for the

7     government to take this information --

8          THE COURT:  So you don't know where the

9     shipment is going or anything like that?

10          MR. YOUNG:  We know where the shipment was

11     going.  We have the -- the shipper and the

12     recipient.  We have more information.  We have

13     enough information to think that -- that we could

14     at a minimum with some additional discovery from

15     the defendants be able to assign a damage value for

16     the false claims that the defendants have provided

17     for us.

18          THE COURT:  Let me go back to what I was

19     first hearing about the way things work.  Did you

20     agree with the defendants' description of how this

21     all worked about carrier putting in -- it was

22     posted on a central registry carrier?

23          MR. YOUNG:  Yes, your Honor.  The

24     defendants I think generally characterized this

25     correctly.  And I wouldn't say they really got

1     anything too wrong.  I would just say with respect

2     to these tenders, the way it worked was they

3     applied to DOD to basically say we want to be able

4     to put our tender in the catalog.  So that various

5     DOD transportation officers could then essentially

6     say we want to ship some freight, open the catalog,

7     or access the catalog and see which carrier they

8     wanted to use.  So I think -- I think that point

9     may have gotten lost in the shuffle a little bit.

10          THE COURT:  So say this shipping household

11    goods for service members, that's what we're

12    talking about here, right, most of these or all of

13    them?

14          MR. YOUNG:  It's not just household goods.

15    I think it --

16          MR. HILL:  (Indiscernible).

17          MR. YOUNG:  It's all manner of freight.

18    It's weaponry.  It's equipment.  It's supplies.  I

19    mean, there are shipments to Department of Defense

20    installations and bases throughout the United

21    States that do all manner of things.  And as we

22    included in Exhibit A, it's, you know,

23    various branches of the Department of Defense.

24          THE COURT:  But it could be hauling a

25    bunch of different things.  I must have

1     misunderstood.  I thought it was only household

2     goods when we started the conversation.

3              MR. YOUNG:  No, your Honor.  It was all

4     manner of -- of --

5              THE COURT:  Okay.  So they put in --

6     excuse me.  They put in an actual -- I'm going to

7     use the word bid or I think you use the word tender

8     for it?

9              MR. YOUNG:  That's correct.  Your Honor,

10    they submitted an application to essentially be

11    considered.  And the -- the Department of Defense

12    command, the SDDC command, was basically the

13    gatekeeper for those applications.  So, in order to

14    be --

15             THE COURT:  In order -- what I'm trying to

16    get at is, you know, especially in private practice

17    I dealt often with we need somebody to do this, and

18    the other side would say yeah, and they'd submit

19    their thing, and had a whole set of terms on the

20    back of the form.  The other side, okay, we accept.

21    They have a whole set of the different terms on the

22    back of the form.  That's what I'm trying to find

23    out here, is there anything like that in this case?

24             MR. YOUNG:  Excuse me, your Honor.  As we

25    alleged, in the application as a standard

1    essentially condition of acceptance, the defendants

2    had to and all carriers had to say that they would

3    follow the MFTRP, the Department of Defense rules

4    governing these transactions and these shipments.

5    So that was -- that was a necessary --

6              THE COURT:  And that would be in their

7    tender or their --

8              MR. YOUNG:  Yes, they would have to say --

9              THE COURT:  They agreed to do that?

10             MR. YOUNG:  Right.  Yes, your Honor.  And

11   in their tenders they would say we -- we admit that

12   the MFTRP is the governing rule for this

13   transaction.

14             THE COURT:  And then in the bill of lading

15   it stated that also?  You sent back the bill of

16   lading, is that right, or no?

17             MR. YOUNG:  Your Honor, I don't believe

18   the bill of lading spoke to that, but I'd have

19   to --

20             THE COURT:  What was it that you sent to

21   the carrier to let them know they were hired and

22   here's the terms?

23             MR. YOUNG:  Your Honor, honestly I'm not

24   entirely clear how the process worked at that point

25   other than there was obviously some notice that the

1    government provided to the defendants saying we'd

2    like to use you to ship freight.

3            THE COURT:  Okay.  But you don't know if

4    there was -- what the terms were?

5            MR. YOUNG:  No.  I mean -- and, your

6    Honor, we're talking about thousands and thousands

7    of tenders here.  So I would hesitate to speak as

8    to any one.  But one thing --

9            THE COURT:  I'm assuming it was the same

10   language on any one --

11           MR. YOUNG:  I think that's probably

12   correct, your Honor.  And one additional point

13   though on this -- on this tender piece is that the

14   defendants -- as we alleged, the defendants also

15   made representations beyond just the standard, you

16   know, essential, you know, boxes that you had to

17   check in order to qualify.  So as we allege in

18   paragraph 92 that the defendants -- in 2008 Yellow

19   sent an example of their tenders to -- to DOD and

20   that they promised that when -- Yellow promised to

21   reweigh the shipment it would correct the billed

22   weight accordingly.

23           THE COURT:  In this tender Yellow promised

24   that when it reweighed a shipment it would quote,

25   correct the billed weight accordingly, close quote.

54

1      I thought that's what I was just asking.  Maybe I

2      wasn't clear.

3              MR. YOUNG:  If it was, your Honor, I

4      misunderstood.  I'm sorry.

5              THE COURT:  Were there terms in there that

6      told them what they were supposed to do and they

7      agreed to those terms or -- okay.

8              MR. YOUNG:  Your Honor, I think -- I think

9      I may have been confused, because I was thinking

10     about terms that the government would have imposed,

11     and this was a representation that Yellow was

12     making on its own.  So it wasn't required to

13     provide this language.  This is an assurance it

14     provided to the government in addition to, you

15     know, its required assurance that it would follow

16     the -- you know, it would abide by the MFTRP and

17     follow those rules.

18             THE COURT:  Okay.  I just want you to talk

19     briefly about the issue about the speaker, for

20     instance, Exhibit A not having any of the

21     particular defendants noted.

22             MR. YOUNG:  Yes, your Honor.  Well --

23     well, two things on that.  First, as we -- as we

24     allege in the complaint, Yellow and Roadway merged

25     in 2009 to become YRC.  So when we allege claims

1    that are from 2010 to 2012 essentially after the

2    parties had merged we alleged them on, you know --

3              THE COURT:  Your position --

4              MR. YOUNG:  We thought it was evident that

5    it was YRC.

6              THE COURT:  It doesn't matter, because

7    it's one or the other, and now they're together.

8              MR. YOUNG:  Yes, your Honor.  And also

9    that at this point they had merged, and it's all

10   one entity.  We'd also say that to the extent that

11   we didn't differentiate between the various

12   defendants, that's -- that's not correct, your

13   Honor.  We discuss in the complaint when Roadway

14   started its allegedly fraudulent reweigh practices.

15   We allege when Yellow started its allegedly

16   fraudulent reweigh practices.  We differentiated

17   between the various companies when appropriate.

18             THE COURT:  I think Mr. Cenawood's [sic]

19   point was Exhibit A you don't -- you don't say

20   which company.  I mean, those are the list of

21   claims, right?

22             MR. YOUNG:  That's correct, your Honor.

23             THE COURT:  You don't say which company.

24             MR. YOUNG:  We don't say which company

25   because we -- given that the companies had merged

1    at that point, we did not think we needed to

2    identify them.  But we did, your Honor, identify in

3    Exhibits B, C, and D the tenders that each company

4    had accepted by the Department of Defense.

5              THE COURT:  Okay.  My last question for

6    you.  You mentioned Escobar laid out you can prove

7    the materiality in one of two ways.  Can you just

8    point me where that is in the decision?

9              MR. YOUNG:  Yes, your Honor.  It's -- it

10   is -- the pin cite is 136 S.Ct. and then it's 2002

11   to 2003.  And the court essentially stated -- there

12   was some discussion about whether materiality was

13   governed by --

14             THE COURT:  Hang on a second.  Let me try

15   to find it here.  Okay.  I'm on 2002.

16             MR. YOUNG:  I'm thinking of the

17   paragraph -- I mean, it's really the --

18             THE COURT:  Tell me what the paragraph

19   starts with.

20             MR. YOUNG:  I'm thinking just -- you can

21   start at the beginning of Section B, but it also --

22   your Honor, I would just start at the paragraph

23   that says we need not decide whether Section

24   3729(a)(1)(A)'s materiality requirement is governed

25   by Section 3729(b)(4) or derived directly from the

1    common law.

2            THE COURT:  Okay.  And then it says in

3    tort law, for instance, a, quote, matter is

4    material, close quote, in only two circumstances,

5    one, if a reasonable man would attach importance to

6    it in determining his choice of action in the

7    transaction, and that's what you're arguing --

8            MR. YOUNG:  Yes, your Honor.

9            THE COURT:  -- correct?  Or two, if the

10   defendant knew or had reason to know that the

11   recipient of the representation attaches importance

12   to the specific matter in determining his choice of

13   action, even though a reasonable person would not.

14       Okay.  Anything else, Mr. Young?

15           MR. YOUNG:  Your Honor, I would just -- to

16   conclude, I would just say that this case is really

17   what the False Claims Act is designed to prevent.

18   The False Claims Act was enacted in order to

19   protect the public fisc and help the government

20   fight fraud, and the defendants in their pleadings

21   have really attempted to thwart that purpose by

22   misreading the applicable law and adding some

23   really hyper technical pleading requirements that

24   don't exist.

25           THE COURT:  You know, I apologize.  I told

1     you I asked my last question.  I didn't.  I just

2     remembered something I wanted to ask you.  The

3     third cause of action, the -- what do they call it,

4     the reverse false claims?

5              MR. YOUNG:  Yes.  Yes, your Honor.

6              THE COURT:  I guess I'm not getting that.

7     Your first do clause says they submitted a false

8     claim.  They asked for too much money.  The third

9     one says they didn't pay back an overpayment.  I

10    guess I'm having trouble understanding, one, why

11    that's different.  It seems you have to establish

12    the overpayment before you can possibly say they

13    had to return the money; and two, what does that

14    give you that you don't have I guess is my -- how

15    does that change the dynamics of this case I guess

16    I don't understand.

17             MR. YOUNG:  Those are very fair questions,

18    your Honor.  The reverse false claims allegations

19    only concern two specific contracts and really a

20    fraction of the claims at issue.  There are two

21    contracts that Yellow and Roadway entered into in I

22    believe 2006 and they span to 2009.  And those

23    contracts had a unique provision that's separate

24    from essentially all the other allegations in the

25    complaint saying that the defendants had an

1    obligation to essentially return overpayments to

2    the government.  So in terms of what it -- what it

3    gets us and how it differentiates, the defendants'

4    false statements regarding weights essentially

5    prevented the government from enforcing that

6    overpayment provision in the contract, because it

7    prevented the government from knowing that not only

8    that overpayments existed, but how much they were,

9    to what extent they were.  And then in terms of

10   what it gets us, it -- it's -- if for some reason

11   the defendants submitting false claims or claims

12   for weights that were inflated under those

13   contracts, if somehow those claims were not

14   actionably false, then this -- the reverse false

15   claim -- excuse me, the reverse false claim

16   allegations would give us an alternate means of

17   recovery.

18           THE COURT:  I'm still not sure I get it.

19   It seems to me you've got to establish that they

20   made a false claim before -- under the scenario we

21   have present.  It's not like a scenario where

22   somebody accidently sent them too much money and

23   they kept it and didn't return it.  That's not what

24   happened here, I don't think.

25           MR. YOUNG:  Correct, your Honor.  The

1      distinction the courts have found in cases where

2      there were essentially redundant allegations is --

3      the courts have found that when there is no

4      preexisting obligation, when there's no separate

5      obligation to return overpayments, then it's --

6      it's two sides of the same coin.

7          Here, there is -- there is that preexisting

8      independent contractual obligation to return

9      overpayments.  So, there's -- you know, there is

10     some difference there.

11             THE COURT:  Well, let's assume it was a --

12     under those two contracts there was a false claim,

13     just like we've gone through all of this.  Then

14     that would be classified as an overpayment that

15     they had to return?  Wouldn't you have to prove it

16     was false in the first instance?

17             MR. YOUNG:  Well, your Honor, we -- we

18     wouldn't have to prove -- we'd have to prove --

19             THE COURT:  Or do you not have to prove

20     it's a fraud?

21             MR. YOUNG:  We would have to prove that

22     the -- we'd have to essentially prove the elements

23     with respect to retention of the overpayment as

24     opposed to submission of the false claim.

25             THE COURT:  Well, I think maybe I'm -- so,

1    with regard to Count 3 with that section of

2    statute, is there no scienter or knowledge?  It's

3    just oh, you got -- all you have to know is you got

4    overpaid.  You don't have to have been fraudulent,

5    it doesn't have to be --

6          MR. YOUNG:  There is, your Honor.  The way

7    we look at this -- the way we look at this is the

8    defendants made false -- submitted false claims in

9    order to get paid.  And then just for these two

10   contracts the defendants' false statements also

11   served a separate purpose, which was essentially to

12   prevent the government from enforcing this

13   contractual provision and saying you've received

14   overpayments and you need to pay us back.  We're

15   not disputing that these are closely related

16   factually, these theories of recovery.  But we do

17   think they are, you know, independent for legal

18   purposes, and we should be able to proceed

19   accordingly.

20         THE COURT:  Okay.  Mr. Cenawood [sic], you

21   want to --

22         MR. HILL:  Just -- just a couple of

23   things, your Honor.

24         THE COURT:  Do I have you guys wrong?

25         MR. CENAWOOD:  Yeah, he's Mr. Hill.

1          THE COURT:  Oh, Mr. Hill.  I'm sorry.

2          MR. HILL:  He probably could make the

3    argument better.  Maybe I should -- just couple of

4    things, your Honor.  We believe, contrary to what

5    was argued today by the government, the

6    government -- the government was aware of the

7    interpretation and the policy of how they handled

8    the negative reweighs as of the qui tam filing.  We

9    offer that so that the Court can use that as an

10   anchor point to decide whether or not they have

11   taken and pled any action that would demonstrate

12   this approach to the contract was material.  So we

13   disagree with that.

14        The other thing that we would point out -- I'm

15   not sure if this was where the Court was going or

16   not, but the Court was asking about the amendments,

17   and in particular we would argue that the 2013

18   amendment to the rule established that the

19   interpretation was reasonable that they were taking

20   and that it necessitated an amendment, that the

21   Court can take judicial notice of that.

22          THE COURT:  You're arguing that the 2013

23   amendment, the necessity -- the necessity of such

24   an amendment pointed to the reasonableness perhaps

25   of your client's position?

1          MR. HILL:  That's correct, your Honor.

2          THE COURT:  Okay.

3          MR. HILL:  That's all we have, your Honor,

4     on that.

5          THE COURT:  Okay.  I've read the papers

6     for the change of venue.  Is there anything -- to

7     me, to be honest with you, it boils down to U.S.

8     Attorney's Office worked on the case here.  Is it

9     reasonable to make them go to Kansas?  I mean, that

10    seems to be the bottom line of it.

11         MR. HILL:  Your Honor, the -- just to add

12    to that.  This district has traveled on other false

13    claims matters pending outside of the district, the

14    Western District.  So, they are capable and have

15    done that.  They did so in the prefiling discovery

16    that they conducted.  And we would suggest that

17    when you balance the two, the convenience of the

18    witnesses primarily residing in Kansas and the

19    documents primarily residing in Kansas sort of tilt

20    the scale.

21       One other thing just to note, your Honor, is

22    that the inference is that some of the witnesses

23    that would be called still work at the defendants,

24    have meaningful roles in the public company, and

25    that the idea of them being able to be in the

1   district where they are participating in the

2   litigation while still performing their duties and

3   responsibilities to the company, we think that that

4   is what the Western District courts had in mind

5   when they thought about convenience of parties.

6           THE COURT:  Miss Lynch, are you handling

7   this?

8           MS. LYNCH:  Yes, I am.  Thank you.  Judge,

9   I disagree with that characterization.  First of

10  all, I don't also -- by the way, not with your

11  characterization.  I disagree with his

12  characterization.  But I will also say that I don't

13  think that's the only argument about this U.S.

14  Attorney's Office.  I mean, even by Mr. Hill's own

15  statements and Kelly Kendall's statements in the

16  affidavit, it's clear that the majority of

17  witnesses are not in Kansas.  I mean, there -- they

18  only said 11 of them are there.  And they're

19  offering two separate districts as potential venue.

20      This is a nationwide case.  That has happened

21  all across the nation.  The relator is here.  The

22  relator's counsel is here.  The relator has

23  intimate knowledge of the workings of this entire

24  process.  The conduct occurred all over the

25  country.

1          There's no question that the plaintiffs are --

2     I mean the defendants have not made a strong case,

3     which is required in this circuit for the transfer

4     of this case to another district.  The only

5     issue -- the arguments they're trying to make is

6     that the parties and the witnesses, it would be

7     more convenient for them.  It wouldn't.  And we

8     have witnesses from all over the nation with SDDC,

9     not to mention that our Department of Defense --

10          THE COURT:  So for a lot of witnesses it's

11     going to be inconvenient, no matter where it is.

12          MS. LYNCH:  It's going to be inconvenient

13     for everybody, no matter -- we're all going to have

14     to travel.  And to have another U.S. Attorney's

15     Office start engaging in this travel all over is

16     just -- it's a waste of the government resources.

17     It's a waste -- it's a negative impact on the

18     public fisc.  It's absolutely not necessary.

19          THE COURT:  Okay.  I'll consider the

20     matter submitted.  It's always nice to have an

21     argument with good attorneys on both sides.

22          MS. LYNCH:  Thank you, Judge.

23          MR. HILL:  Thank you, your Honor.

24          THE COURT:  Sorry if it took longer than

25     what you thought.  I'm not the sharpest knife in

1    the drawer.  Sometimes I got to ask a lot of

2    questions.

3                MS. LYNCH:  We appreciate that, Judge.

4                THE COURT:  Okay.  Have a great day.  Have

5    a safe trip back.

6                MR. YOUNG:  Thank you, your Honor.

7                MR. HILL:  Thank you, your Honor.

8                THE COURT:  Enjoy our Buffalo weather

9    while you're here.

10                MR. HILL:  We did.  We didn't make that as

11    an argument for the transfer.

12                MS. LYNCH:  Wise move.

13                THE COURT:  Have a great day.

14                MR. YOUNG:  Thank you.

15                MR. HILL:  Thank you, your Honor.

16                *      *      *      *      *      *

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I certify that the foregoing is a

4      correct transcription, to the best of my

5      ability, from the electronic sound recording

6      of the proceedings in this matter.

7

8

9                        s/Michelle L. McLaughlin
                         Michelle L. McLaughlin, RPR
10                          Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25